**The NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, Plaintiff,**

v.

**Robert F. MILLER, Governor, State of Nevada; Carolyn Sparks; James Eardley; Lonnie Hammargren; Shelley Berkley; Jill Derby; Joseph Foley; June Whitley; Daniel Klaich and Dorothy Gallagher, members of the Board of Regents of the University of Nevada; Ronald Ganulin; Tim Grgurich; Jerry Tarkanian; and Shelly Fischer; Defendants.**

No. CV–N–91–526–HDM.

United States District Court,
D. Nevada.

June 5, 1992.

James S. Beasley, Reno, Nev., John J. Kitchin & James H. McLarney, Kansas City, Mo., for plaintiff.

Roy E. Smith, Charles E. Thompson, Las Vegas, Nev., Alton Burkhalter & Terry M. Giles, Santa Ana, Cal., Keith E. Galliher, Jr., Las Vegas, Nev., for defendants.

Donald Klasic, Gen. Counsel, University of Nevada, Reno, Nev., and Bradley L. Booke, Asst. Gen. Counsel, University of Nevada, Las Vegas, Nev., for counterclaim—proposed intervenors.

Dominic P. Gentile and Mark S. Dzarnowski, Las Vegas, Nev., Lorne J. Malkiewich and Kimerly A. Morgan, Legislative Counsel, Carson City, Nev., for second amended complaint.

## MEMORANDUM DECISION AND ORDER

McKIBBEN, District Judge.

The plaintiff, National Collegiate Athletic Association ("NCAA"), filed this action against the defendants, Robert Miller, Ronald Ganulin, Tim Grgurich, Jerry Tarkanian, and Shelley Fischer. Defendants Ganulin, Grgurich, Tarkanian and Fischer, are present or former employees of the University of Nevada, Las Vegas ("UNLV"). The other defendants, joined by order of the court, are members of the University of Nevada Board of Regents. Defendant Robert Miller, Governor of Nevada, was dismissed from this action by previous order of the court.

The NCAA seeks an order of the court enjoining the application of Nev.Rev.Stat. §§ 398.155—398.255 to an infractions case involving the NCAA, UNLV, Ronald Ganulin, Tim Grgurich, Jerry Tarkanian, and Shelley Fischer.

The NCAA also seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, that Nev.Rev.Stat. §§ 398.155—398.255 is void because: (1) the statute imposes a direct burden on interstate commerce in violation of Article I, Section 8, Clause 3 of the United States Constitution; (2) the statute substantially impairs existing contractual rights and obligations running between the NCAA and its members in violation of the Contract Clause of Article I, Section 10 of the Constitution; (3) the statute arbitrarily deprives the NCAA and its members of the right to freely associate with each other to maintain their intercollegiate athletics programs in violation of the First Amendment; and (4) the statute contains provisions which are vague and overbroad in violation of the Due Process Clause under the Fourteenth Amendment.

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983.

## BACKGROUND

The NCAA is a voluntary, unincorporated association of colleges, universities, and affiliated conferences and organizations. The NCAA consists of approximately one thousand, fifty-six (1,056) members, including most public and private universities and four-year colleges. Its members conduct major athletics programs in all fifty (50) states. The University of Nevada, Reno ("UNR"), and UNLV are members of the NCAA.

A basic purpose of the NCAA is to "maintain intercollegiate athletics as an integral part of the educational program" and to "retain a clear line of demarcation between intercollegiate athletics and professional sports." NCAA Const. art. 1.3.1. The policies that govern the recruitment, admission, financial aid, and eligibility of students who compete in intercollegiate athletics are determined by the NCAA member institutions at their annual conventions. The NCAA constitution, bylaws, and other governing rules and regulations are approved by a vote of the members.

By joining the NCAA, each member institution agrees to comply with and enforce the rules of the NCAA. NCAA Const. art. 2.5.1. All staff, student athletes, and other individuals representing the member institution's athletics interests must also comply with these rules. NCAA Const. art. 2.5.1. The NCAA enforcement procedures are applied to a member institution when

that institution fails to fulfill its obligations to apply and enforce NCAA rules. NCAA Const. art. 1.3.2.

The enforcement programs are administered by the NCAA Committee on Infractions. This committee supervises an investigative staff, makes factual determinations relating to any possible rules violations, and imposes appropriate penalties on member institutions found to be in violation of NCAA rules. In addition, the NCAA bylaws provide for a mechanism for individual member institutions to monitor their own athletics programs. This aspect of the enforcement program is designed to permit member institutions to police their own intercollegiate athletics programs and to take voluntary corrective action.

When allegations of a rule violation come to the attention of the NCAA enforcement staff, a notice of preliminary inquiry is delivered to the member institution involved. If, after investigation, the NCAA staff determines that a possible rule violation has occurred, the institution is advised and an official inquiry is commenced. The institution is requested to investigate the allegations, and the institution then reports its findings to the Committee on Infractions and suggests appropriate corrective action.

A pre-hearing conference is held with the institution, the affected individuals, and NCAA staff. At the pre-hearing conference, the NCAA staff is required to advise the parties of information it intends to use to support the allegations in the official inquiry before the committee, and the parties are permitted to review memoranda and documents relating to the alleged infractions prior to the official inquiry. The institution and the affected parties are permitted to appear at the official hearing before the Committee on Infractions. There, those involved may contest the allegations and present arguments and information to the committee. However, the NCAA has no power to issue subpoenas or to compel a witness to appear or give sworn testimony.

After the official hearing and private deliberation, the committee issues written findings of violations and recommends corrective action. The NCAA does not take corrective action against individual representatives or student athletes of the institution. Instead, the NCAA takes corrective action against the member institution itself.

Appeals may be taken from the committee's findings to the NCAA council. Finally, the NCAA rules provide for a further appeal to the full membership of the NCAA.

In this case, the NCAA received information of possible rule violations at UNLV and, on December 17, 1990, sent a notice of official inquiry to UNLV describing the possible violations. Between December 17, 1990, and April, 1991, the NCAA staff and UNLV conducted separate investigations of the UNLV intercollegiate basketball program. Witnesses were interviewed, information was exchanged, and documents were secured in preparation for the official hearing before the Committee on Infractions. On July 19, 1991, the NCAA notified UNLV that a prehearing conference would be held on September 9, 1991, and that the official hearing was scheduled for September 27–29, 1991.

Meanwhile, on July 11, 1991, Defendants Tim Grgurich and Ron Ganulin, through written correspondence, demanded that the NCAA abandon its existing procedure for conducting the investigation and holding the official hearing. Rather, these defendants insisted that the NCAA conduct the investigation and hearing in complete accord with Nev.Rev.Stat. §§ 398.155—398.255, enacted into law on April 8, 1991. On August 5, 1991, and August 15, 1991, respectively, Defendants Jerry Tarkanian and Shelley Fischer made similar written demands on the NCAA for compliance with the new Nevada law.

These defendants advised the NCAA that any appearance by them at a hearing before the NCAA Committee on Infractions is conditioned upon the NCAA complying with certain provisions of Nev.Rev.Stat. §§ 398.155—398.255. These demands included:

(1) that at least thirty (30) days prior to the prehearing conference the NCAA give each defendant copies of all documents the NCAA intends to rely upon or use in any manner;

(2) that each defendant be given the opportunity to confront all witnesses;

(3) that the NCAA provide the defendants all exculpatory statements obtained by the NCAA;

(4) that the Committee on Infractions is not impartial and that an independent and impartial entity be selected to adjudicate the facts and corrective actions;

(5) that all proceedings of the NCAA hearing be open to the public, recorded and transcribed; and

(6) that all other provisions of Nev.Rev. Stat. §§ 398.155—398.255 be followed.

The NCAA responded that it could not comply with the defendants' requests without violating the NCAA's substantive and procedural rules applicable to all NCAA member institutions and that it could not apply those substantive and procedural rules uniformly in all enforcement proceedings if it were to comply with the demands of the defendants in this case. Thereafter, the NCAA filed this action for declaratory and injunctive relief.

## ABSTENTION

Defendants first contend that this court should abstain from considering the federal constitutional questions raised in the plaintiff's complaint and should allow this case to proceed in the state forum.

■ Where resolution of state law questions may obviate the need for a federal court to resolve federal constitutional issues, the federal court may abstain to allow the controversy to proceed in the first instance in a state forum. *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). "[F]ederal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2331, 81 L.Ed.2d 186 (1984). However, abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). Pullman abstention is limited to those cases in which the construction of a state statute by a state court could avoid or modify the federal constitutional question. *Zwickler v. Koota,* 389 U.S. 241, 248–49, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967). Abstention is "the exception and not the rule." *City of Houston v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 2512, 96 L.Ed.2d 398 (1987).

The Ninth Circuit has instructed that abstention is appropriate only when (1) the case involves a sensitive area of social policy which federal courts ought not enter absent the lack of an alternative, (2) a definitive ruling by the state court would avoid the constitutional question, and (3) the issue of state law is doubtful. *C.Y. Development Co. v. City of Redlands,* 703 F.2d 375, 377 (9th Cir.1983).

■ In this case, the prerequisites to abstention are not satisfied. First, this case does not call into question "a sensitive area of social policy." Nev.Rev.Stat. §§ 398.155—398.255 was not designed to address a "sensitive" social problem. Rather, the challenged state law is narrowly directed at and intended to modify the conduct of a single private entity, the NCAA. Thus, the court finds no sensitive area of social policy upon which this court might intrude unnecessarily by proceeding to the merits of this case.

Second, a judicial construction of the statute by a state court would not avoid the federal constitutional questions raised by the NCAA. This statute is relatively short and not overly complex. Resolution of state law issues would not terminate the federal constitutional controversy. Accordingly, this court concludes that the Pullman abstention doctrine does not apply in this case.

**1482**

## THE COMMERCE CLAUSE·

■ The NCAA contends in count one of its complaint that Nev.Rev.Stat. §§ 398.-155—398.255 violates the Commerce Clause of the United States Constitution. Under Article I, Section 8, Clause 3 of the United States Constitution, Congress is granted the power "to regulate commerce ... among the several States...." Although the Commerce Clause is phrased as an affirmative grant of power to Congress, the Supreme Court has long recognized that "the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States." *Freeman v. Hewit*, 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946). This aspect of the Commerce Clause limits state interference with interstate commerce. *See H.P. Hood & Sons, Inc. v. C. Chester Du Mond*, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949).

■ In this case, the threshold inquiry is whether the regulatory activities of the NCAA involve interstate commerce for purposes of Commerce Clause protection in light of the educational objectives of the NCAA. A principal purpose of the NCAA is to promote amateurism in intercollegiate athletics and to ensure that athletics are an integral part of the academic process through the cooperative and collective efforts of the member institutions. Yet, as the Fifth Circuit observed, "[w]hile the participating athletics [sic] may be amateurs, intercollegiate athletics in its management is clearly business, and big business at that." *Hennessey v. NCAA*, 564 F.2d 1136, 1150 (5th Cir.1977). The NCAA and its member institutions are "significantly involved in interstate commerce in the conduct of the athletic programs." *Id.* at 1150; *See also Banks v. NCAA*, 746 F.Supp. 850, 857 (N.D.Ind.1990). The record before this court amply supports these conclusions.

The NCAA conducts seventy-six (76) annual NCAA championship events throughout the United States involving member teams and individual student athletes from across the country. The games and tournaments scheduled by the NCAA necessitate the transportation of teams across state lines. In addition, the NCAA controls bids involving hundreds of millions of dollars for interstate television broadcasting of intercollegiate sports events. *See Board of Regents of the University of Okla. v. NCAA*, 546 F.Supp. 1276, 1289–92 (W.D.Okla.1982). Finally, collegiate recruiting of perspective team members takes place on a national and even international scale and the NCAA strictly regulates this recruiting activity. As the Supreme Court has held in the context of an antitrust case involving the NCAA, the "product" marketed by the NCAA is intercollegiate competition. *NCAA v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 101, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984).[1] Accordingly, the court concludes that the national scope of the NCAA's activities are sufficient to establish the requisite interstate involvement under the Commerce Clause.

---

1. In *NCAA v. Board of Regents of the Univ. of Okla.*, the Supreme Court stated that:

What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agree to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which the institutions compete. Moreover, the NCAA seeks to market a particular brand of football—college football. The identification of this "product" with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. *Id.* at 101–102, 104 S.Ct. at 2960.

The court must next consider whether the statute violates the Commerce Clause. In *Brown–Forman Distillers Corp. v. New York Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Supreme Court, drawing from its earlier Commerce Clause decisions, articulated a two-tiered approach to be used when determining the validity of a state statute under the Commerce Clause. The Court instructed that "[w]hen the statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, ... [the statute is] generally struck down ... without further inquiry." *Id.* at 579, 106 S.Ct. at 2084. However, when "a statute has only indirect effects on interstate commerce and regulates evenhandedly, ... [the court examines] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* at 579, 106 S.Ct. at 2084; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

■ Initially, therefore, the court must consider whether the Nevada law directly discriminates against interstate commerce or amounts to "economic protectionism." If so, the statute must be considered per se invalid under the Commerce Clause. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978); *Evergreen Waste Sys. v. Metro. Serv. Dist.*, 820 F.2d 1482 (9th Cir.1987); *Valley Bank of Nev. v. Plus Systems, Inc.*, 914 F.2d 1186, 1194 (9th Cir.1990). In *Evergreen*, the Ninth Circuit upheld a local ordinance against a Commerce Clause challenge that proscribed the use of a certain landfill by those outside the metropolitan service district. In ruling that the ordinance was not per se invalid, the court stated that the Oregon law did not "fit the Court's paradigm of a per se violation: one that overtly blocks the flow of interstate commerce at a State's borders." *Id.* at 1488.

■ In this case, Nev.Rev.Stat. §§ 398.-155—398.255 also does not fit the Supreme Court's model of a state statute which is per se invalid under the Commerce Clause. The challenged statute seeks to impose certain minimum "due process" procedural standards on the NCAA when the NCAA is investigating a Nevada NCAA member institution. The statute does not facially or directly discriminate against interstate commerce, nor does it sound of economic protectionism. Further, the statute's effect on interstate commerce is only indirect; that is, it does not overtly thwart or block the NCAA's relationship with the Nevada member institutions or its relationship with member institutions in other states. Accordingly, the court concludes that Nev. Rev.Stat. §§ 398.155—398.255 is not per se invalid under the Commerce Clause.

■ Next, the court turns to an analysis of the statute under the "balancing" approach. Under this approach the court must first identify the state's interests in its legislation, ensure that those interests are legitimate, and then determine whether the state law imposes an excessive burden on interstate commerce in relation to those legitimate interests. *Valley Bank of Nev. v. Plus Sys., Inc.*, 914 F.2d 1186, 1194 (9th Cir.1990).

■ Defendants contend that the stimulus for the legislation is a concern that Coach Tarkanian and the other defendant coaches will not receive a fair hearing consistent with notions of due process and fundamental fairness if the existing NCAA rules and procedures are applied in the investigative and hearing process. According to the defendants, the public purpose to be served by the enactment of the statute is to afford basic due process safeguards to the careers, livelihoods, and reputations of all Nevadans, including students and employees of Nevada NCAA member institutions, the alumni of these institutions, and the fans and boosters of Nevada intercollegiate sports. While these are narrowly tailored interests, they are, nevertheless, matters of legitimate local public interest. This conclusion, however, does not end the inquiry.

■ Even though a state statute addresses an area of legitimate state concern,

it may still violate the Commerce Clause if it imposes an improper burden on interstate commerce. The state statute must not be "excessive in relation to the local interests served by the statute." *Edgar v. MITE Corp.*, 457 U.S. 624, 643, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982).

The NCAA persuasively argues that its ability to accomplish its goals of scholarship, sportsmanship, and amateurism depends to a substantial degree on the creation of nationally uniform rules under which teams can compete on an equal basis. In order to satisfactorily achieve these goals, the NCAA's enforcement procedures must be applied even-handedly and uniformly on a national basis.

The Nevada statute, however, mandates procedures which are both substantially different from those contained in the NCAA bylaws and significantly burdensome on the NCAA's objective of maintaining a "level playing field" within intercollegiate athletics. For example, Section 398.155(2) of the statute provides that "[a] party to a proceeding ... is entitled to confront and respond to all witnesses and evidence related to the allegation against him...." Yet, the NCAA bylaws contain no comparable provision because the NCAA lacks subpoena power. Thus, since the NCAA does not have the ability to subpoena witnesses or otherwise require their cooperation, an infractions proceeding could not practicably be processed in compliance with the provisions of the Nevada statute.

In addition, Nev.Rev.Stat. § 398.195 requires that the hearings be conducted by an "impartial" hearing officer. However, under existing NCAA rules, only the membership convened at conventions may authorize someone other than the Committee on Infractions to conduct an infractions hearing.[2] Therefore, the NCAA would be unable to comply with this provision of the Nevada law absent membership approval at a convention.

Finally, Nev.Rev.Stat. § 398.235(2) precludes the NCAA from expelling its Nevada institutions if those institutions refuse to comply with the provisions of the bylaws and constitution of the NCAA which are in conflict with the statute. This provision and similar provisions in other states would strip the NCAA of the authority to freely adopt its own procedural regulations. Because the NCAA enforcement proceedings would clearly be paralyzed by these procedural requirements, the NCAA would likely be reluctant to use its resources to enforce rules evenhandedly in the several venues in this country.[3]

A statute's effect beyond the enacting state's borders is also relevant in balancing the affected interests. The court must closely scrutinize a statute which controls commerce outside its borders. *See Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Brown–Forman Distillers v. New York Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). An extraterritorial regulation exceeds the inherent limits of the enacting state's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. *Edgar v. Mite Corp.*, 457 U.S. 624, 642, 102 S.Ct. 2629, 2640, 73 L.Ed.2d 269 (1982). In *Edgar*, the Supreme Court held that the state statute at issue failed the balancing prong of the *Pike* test precisely because the "most obvious burden the Illinois Act imposes on interstate commerce arises from the statute's previously described nationwide reach...." *Edgar*, 457 U.S. at 643, 102 S.Ct. at 2641.

Here, the extraterritorial effect of the Nevada statute is substantial. It severely restricts the NCAA from establishing uniform rules to govern and enforce interstate collegiate practices associated with intercollegiate athletics. The likely practical effect of the statute would be to compel the NCAA to adopt the procedural rules enacted by the Nevada Legislature, thereby allowing the Nevada Legislature to effective-

---

2. *See* Berst Deposition, pp. 76–77.

3. *See* Wright Affidavit, para. 12.

ly dictate enforcement proceedings in states other than Nevada. Further, "the practical effect of the statute must be evaluated by considering the consequences of the statute itself, but also in considering how the challenged statute may interact with the legitimate regulatory schemes of other states and what effect would arise if not one, but many or every, state adopted similar legislation." *Healy*, 491 U.S. at 336, 109 S.Ct. at 2499. Here, as the record reflects, a strong possibility exists that other states will adopt legislation inconsistent with the Nevada statute, thus precluding the NCAA from having a uniform rule and procedural basis for conducting its investigation and review of member institutions.[4]

While the concerns the Nevada law is designed to address are legitimate, and while similar concerns have been expressed by the legislatures of other states,[5] any narrow interests the State of Nevada may have in imposing the requirements of Nev. Rev.Stat. §§ 398.155—398.255 for the protection of institutions and individuals residing in Nevada is outweighed by the general harm to the uniform enforcement of regulations by the NCAA and its member institutions throughout the country. Nev.Rev. Stat. §§ 398.155—398.255 effectively invalidates the NCAA's system of internal governance and enforcement and imposes procedural requirements with which the NCAA cannot comply.

Such a finding, of course, does not preclude the NCAA member institutions, including the Nevada institutions, from securing desired changes in the NCAA by-

laws which regulate the investigative and enforcement procedures.

Therefore, the court concludes that applying the provisions of Nev.Rev.Stat. §§ 398.155—398.255 to the pending infractions case involving UNLV and the individual defendants violates Article I, Section 8, Clause 3 of the United States Constitution.

## THE CONTRACT CLAUSE

The NCAA asserts under count four of its complaint that Nev.Rev.Stat. §§ 398.-155—398.255 substantially impairs existing contractual relations between itself and the Nevada member institutions in violation of the Contract Clause of Article I, Section 10 of the United States Constitution. The Contract Clause provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...."

■ Although the language of the Contract Clause appears absolute, the Supreme Court has long-recognized that a literal construction of the Clause would be "destructive of the public interest by depriving the State of its prerogative of self-protection." *W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 433, 54 S.Ct. 816, 818, 78 L.Ed. 1344 (1934). A proper application of the Contracts Clause takes into account both the degree of contract impairment and the nature and extent of the State's interest underlying the challenged state law. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

---

4. In *South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), the Supreme Court expressed its concern regarding a state statute which has extraterritorial reach:

Unrepresented interests will often bear the brunt of regulations imposed by one State having a significant effect on persons or operations in other States. Thus, "when the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state." On the other hand, when Congress acts, all segments of the country are represented, and

there is significantly less danger that one State will be in a position to exploit others. *Id.* at 92, 104 S.Ct. at 2242–43 (citations omitted).

5. To date four states have enacted legislation directed to the NCAA enforcement proceedings. These states are Nebraska, Illinois, Florida, and Nevada. *See* Fla.Stat. §§ 240.5339—240.5349 (1991); Ill.Ann.Stat., ch. 144 ¶¶ 2901—2913 (Smith–Hurd 1991); Neb.Rev.Stat. §§ 85–1201—85–1210 (1990). The states of Kansas, Ohio, Missouri, South Carolina, and Kentucky are considering similar legislation. In addition, the NCAA itself is taking steps to modify its procedural system of internal governance.

■ Analysis of a Contract Clause claim proceeds in two steps. First, the court must determine whether the state law "substantially impairs the contractual relationship." *General Motors Corp. v. Romein*, — U.S. ——, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992); *In Re LaFortune*, 652 F.2d 842, 846 (9th Cir.1981). This inquiry involves three components: whether there is a contractual relationship; whether a change in law impairs that contractual relationship; and whether the impairment is substantial. *General Motors*, 112 S.Ct. at 1109. If the impairment is minimal, the inquiry ends and the state law is allowed to stand.

Second, if the impairment is substantial, then the court must decide whether the degree of that impairment is both "reasonable and necessary to achieve a valid state interest." *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977); *Continental Ill. Nat'l Bank and Trust Co. of Chicago v. State of Wash.*, 696 F.2d 692, 701 (9th Cir.1983).

■ The threshold issue then is whether a contractual relationship existed between the Nevada member institutions and the NCAA prior to the passage of Nev.Rev.Stat. §§ 398.155—398.255. This question is governed by federal law. *State of Nevada Employees Assoc., Inc. v. Keating*, 903 F.2d 1223, 1227 (9th Cir.1990). The existence of a conventional contract, signed by both parties, is not a predicate to the application of Contract Clause review. *See United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (actionable Contract Clause claim based solely on a contractual relationship created by statute).

■ In this case, UNLV became a member of the NCAA in 1958. UNR became a member in 1965. In exchange for the benefits and privileges that flowed from membership in the NCAA, these institutions

agreed to abide by the NCAA's "Conditions and Obligations of Membership" as expressed in the NCAA Constitution, including "the enforcement procedures of the Association." NCAA Const. art. 1.3.2. Therefore, the record establishes that the NCAA and the Nevada NCAA member institutions have a contractual relationship sufficient to trigger review under the Contract Clause.[6]

■ The court next turns to the question of whether Nev.Rev.Stat. §§ 398.-155—398.255 impairs the obligations under this contractual relationship and, if so, whether that impairment is substantial. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983).

The primary purpose of the NCAA, as set forth in detail in the discussion of the Commerce Clause, is to promote amateur intercollegiate athletics and to ensure that intercollegiate competition takes place on a level and fair playing field. To achieve these goals, the NCAA has promulgated certain substantive rules and regulations relating to, among other things, recruiting, academic eligibility and rules of play. Every NCAA member has voluntarily and contractually agreed to abide by these rules and regulations. If all the members were not bound by these agreed upon rules and regulations, the effectiveness of the NCAA in attaining national uniformity in compliance with these rules and regulations would be severely restricted.

The defendants contend that the Nevada law does not modify or alter the substantive requirements that bind NCAA member institutions. The statute, instead, modifies the process by which the NCAA conducts investigations of alleged substantive violations by its membership by providing for certain "minimum" procedural standards.

---

**6.** Indeed, the legislative findings underlying the very law being challenged acknowledges the contractual nature of the relationship between the NCAA and member institutions: "The legislature finds that: ... Member institutions must agree contractually to administer their athletic programs in conformance with the rules of national collegiate athletic associations; ..." 1991 Nev.Stat. ch. 55, § 1; *see* Nev.Rev.Stat. § 398.-155, Reviser's Note.

However, the substantive effect of these statutory provisions is significant. Investigative and enforcement proceedings, followed by sanctions if warranted, are an important component in the NCAA's ongoing effort to foster fair play in intercollegiate athletics. Yet, as the record reflects, and as the court has discussed in depth under the Commerce Clause analysis, the NCAA cannot comply with certain procedures mandated by the statute in carrying out its investigations of alleged NCAA violations.[7] In addition, under the Nevada statute, the NCAA would face substantial monetary sanctions if it fails to employ these procedural requirements when investigating Nevada member institutions. Thus, enforcement proceedings against Nevada member institutions are effectively precluded, or severely restricted, thereby allowing Nevada institutions to gain an unfair competitive advantage over other members. This result is both inconsistent with the core purpose of the NCAA and indirectly allows Nevada institutions to circumvent the central substantive requirements it contractually agreed to honor. In this court's view, the provisions of Nev.Rev.Stat. §§ 398.155 and 398.255, when considered as a whole, substantially impair the contractual relationship between Nevada member institutions and the NCAA.

 The final issue is whether the degree of impairment is both "reasonable and necessary to achieve a valid state interest," *United States Trust Co. of New York v. New Jersey*, 431 U.S. at 25, 97 S.Ct. at 1519. The Supreme Court has held that the nature of the contractual relationship involved determines the standard of review. If the challenged state law is alleged to have impaired a contractual relationship involving only private parties, the court should willingly defer to legislative judgment regarding the reasonableness and the necessity of the state law. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 243 n. 15, 98 S.Ct. 2716, 2722 n. 15, 57 L.Ed.2d 727 (1978). Conversely,

when the state itself is a party to the contract, less deference is accorded to the legislative assessment of reasonableness and necessity. *United States Trust Co. of New York v. New Jersey*, 431 U.S. at 26, 97 S.Ct. at 1519. The court must evaluate with "particular scrutiny" legislative modification of public contracts "because the State's self-interest is at stake." *Id.* at 25, 97 S.Ct. at 1519. Further, the severity of the impairment measures the height of the hurdle the state legislation must clear. *Allied Structural Steel Co.*, 438 U.S. at 244–45, 98 S.Ct. at 2722–23.

In this case, UNLV and UNR are parties to the contracts with the NCAA. Under Nevada law, these academic institutions are considered arms of the Nevada State Government. *See* Nev.Rev.Stat.Ann. §§ 396.010—396.020 and accompanying annotations. The contractual relationship between the NCAA and the Nevada member institutions is public in nature, and the court must, therefore, closely scrutinize the statutory modifications of the subject contracts. "Complete deference to a legislative assessment of reasonableness and necessity is not appropriate" in the present case. *See United States Trust Co.*, 431 U.S. at 26, 97 S.Ct. at 1519.

The burden, therefore, is on the defendants to show that the contractual impairment was "necessary to achieve an important public purpose." *State of Nevada Employees Assoc., Inc. v. Keating*, 903 F.2d 1223, 1228 (9th Cir.1990). The apparent purpose of the statute, as discussed above, is to afford basic due process safeguards to the careers, livelihoods, and reputations of all Nevadans which include students, alumni, and employees of UNR and UNLV, and the fans and boosters of Nevada intercollegiate sports. While the statute does represent a legitimate exercise of police power, its singular narrow purpose does not elevate it to the level of state laws necessary to protect the health and safety of the people.

7. For instance, under Nev.Rev.Stat. § 398.155, a party under investigation is "entitled to confront and respond to all witnesses and evidence related to the allegations against him...." Yet, unlike a court of law, the NCAA does not possess subpoena power to compel appearance of those witnesses and evidence.

Moreover, impairment of contractual relations as a result of state action is more likely to be upheld when the law imposes a "generally applicable rule of conduct designed to advance a broad societal interest." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 191, 103 S.Ct. 2296, 2306, 76 L.Ed.2d 497 (1983). The law is less likely to survive constitutional scrutiny when it is designed to directly "adjust the rights and responsibilities of contracting parties." *United States Trust Co.*, 431 U.S. at 22, 97 S.Ct. at 1518.

In this case, the Nevada law does not attempt to alleviate a broad societal problem; it specifically targets the NCAA and directs the NCAA to treat Nevada member institutions differently than it treats the other member institutions in contravention of preexisting contractual agreements. The Nevada law's purpose is to adjust the rights and responsibilities of contracting parties. Further, the State of Nevada is attempting to enter a field it had never before sought to regulate; it attempts to bring about a permanent and significant alteration of the contract relationship of those entities within its coverage. *See Allied Structural Steel Co.*, 438 U.S. at 250, 98 S.Ct. at 2725.

Finally, the State has failed to demonstrate that the statute was necessary to achieve a valid state interest. Indeed, the Nevada NCAA member institutions, along with the other member institutions, are free to modify existing contract rights and obligations with the NCAA by amending the NCAA bylaws and constitution. Further, the member institutions or the states are not precluded from asking the Congress to enact legislation to provide additional due process rights as may be deemed appropriate. The Nevada law simply does not possess the attributes of those state laws that have survived challenge under the Contract Clause. *See Allied Structural Steel Co.*, 438 U.S. at 244, 98 S.Ct. at 2722.

Accordingly, the court concludes that the Nevada legislation unconstitutionally impairs the contractual relationship which exists between the NCAA and its Nevada member institutions in violation of Article I, Section 10 of the United States Constitution.

Consideration of the remaining claims raised by the NCAA would not alter the relief granted under Plaintiff's first and fourth causes of action and shall, therefore, not be considered by the court.

In addition, the court has stayed consideration of the counterclaims of Defendant Jerry Tarkanian, in which Lois Tarkanian is also a named party, pending a resolution of the claims disposed of by this decision. Accordingly, that stay is VACATED.

## CONCLUSION

Therefore, the court finds and concludes that the provisions of Nev.Rev.Stat. §§ 398.155—398.255 violate Article I, Section 8, Clause 3 and Article I, Section 10 of the United States Constitution and are invalid and unenforceable against the NCAA. The defendants, Ronald Ganulin, Tim Grgurich, Jerry Tarkanian, Shelley Fischer, and the members of the Board of Regents of the University of Nevada are restrained and enjoined from taking any action to enforce or seek protection under the provisions of Nev.Rev.Stat. §§ 398.155—398.255.

The foregoing shall constitute findings of fact and conclusions of law.

Judgment shall be entered accordingly. The court directs the entry of final judgment as to those claims resolved by this decision and expressly determines there is no just reason for delay in entry of judgment.

It is so ORDERED.