The **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**, an unincorporated association, **Plaintiff,**

**Michael Alsup, Intervenor,**

and

**Jerry Tarkanian, and Lois Tarkanian, Counter–Claimants–Appellants,**

v.

**Robert F. MILLER, Governor, State of Nevada, et al., Defendants,**

and

The National Collegiate Athletic Association, Walter Byers, S. David Berst, and Robert Stoup, Counter–Defendants–Appellees.

The **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**, an unincorporated association, **Plaintiff–Appellee,**

v.

**Robert F. MILLER, Governor, State of Nevada, et al., Defendants,**

and

**Tim Grgurich; Ronald Ganulin, Defendants–Appellants.**

The **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**, an unincorporated association, **Plaintiff,**

and

**Shelley Fischer, Counter–Claimant–Appellant,**

v.

**Robert F. MILLER, Governor, State of Nevada, et al., Defendants,**

and

The National Collegiate Athletic Association, Walter Byers, S. David Berst, and Robert Stoup, Counter–Defendants–Appellees.

Nos. 92–16184, 92–16227 and 92–16234.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1993.

Decided Nov. 23, 1993.

Alton G. Burkhalter, Giles & Burkhalter, Santa Ana, CA, for defendant-appellant Jerry Tarkanian.

Roy E. Smith, Galatz, Earl, Catalano & Smith, Las Vegas, NV, and Charles E. Thompson, Thompson & Harper, Las Vegas, NV, for defendants-appellants Tim Grgurich and Ronald Ganulin.

Keith E. Galliher, Jr., Las Vegas, NV, for defendant-appellant Shelley Fischer.

John J. Kitchin, Swanson, Midgley, Gangwere, Clarke & Kitchin, Kansas City, MO, and James S. Beasley, Beasley, Holden & Brooks, Reno, NV, for plaintiff-appellee The National Collegiate Athletic Ass'n.

Before: TANG, TROTT and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Jerry Tarkanian, Tim Grgurich, Ronald Ganulin, and Shelley Fischer appeal the district court's order declaring that the provisions of Nevada Revised Statutes §§ 398.-155–398.255[1] ("the Statute"), which impose certain requirements on interstate national collegiate athletic associations, violate Article I, Section 8, Clause 3 (the Commerce Clause) and Article I, Section 10 (the Contract Clause) of the United States Constitution. The district court granted the declaratory judgment and enjoined appellants from taking any action to seek protection under the Statute.[2] We affirm.

## BACKGROUND

The National Collegiate Athletic Association ("NCAA") is a voluntary, unincorporated association of 1,056 members, including four-year colleges and universities, conferences, associations, and other educational institutions. Members of the NCAA are located in each of the United States.

Among the purposes of the NCAA are these: 1) "to initiate, stimulate and improve intercollegiate athletics programs for student-athletes;" 2) "to uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this Association;" 3) "to encourage its members to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship and amateurism;" 4) "to formulate ... and publish rules of play governing intercollegiate athletics;" 5) "to supervise the conduct of, and to establish eligibility standards for, regional and national athletics events;" 6) "to legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics[;]" and 7) "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports." NCAA Const. §§ 1.2 and 1.3.1. The Association is also entrusted with the responsibility of promoting the opportunity for competitive

---

1. 1991 Nev.Stat. ch. 55.

2. *NCAA v. Miller,* 795 F.Supp. 1476 (D.Nev.1992) (*Miller I*).

equity among its member institutions. *Id.* § 2.7.

At the annual convention, the member institutions of the NCAA enact legislation dealing with athlete recruiting, eligibility, financial aid, admissions, and other matters. All NCAA legislation must be adopted by a vote of the active members. *Id.* § 5.01.1. NCAA legislation consists of both substantive rules and a procedural enforcement program. As a condition of membership, each institution is obligated to apply and enforce all NCAA legislation related to its own athletic programs. *Id.* § 1.3.2. The NCAA Manual also specifically provides that: "the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." *Id.; see also NCAA v. Tarkanian,* 488 U.S. 179, 183, 109 S.Ct. 454, 457, 102 L.Ed.2d 469 (1988).

Whenever an alleged rules violation is reported to the NCAA, the matter is handled pursuant to the enforcement program. The enforcement program is administered by the Committee on Infractions, which establishes investigation procedures that must later be approved by the NCAA Council and the full membership of the NCAA. The Manual details the procedures that must be followed in processing an infractions case. NCAA Bylaws 19, 32.

The first step in the process is for the enforcement staff to notify the institution in question that the NCAA is making a preliminary inquiry into the institution's athletics policies and practices. NCAA Bylaw 32.-2.2.4. If the enforcement staff determines that a possible rule violation has occurred, it sends an official inquiry letter to the chief executive officer of the institution. The official inquiry must include a statement of the NCAA rule alleged to have been violated and the details of each separate allegation. The enforcement staff must also provide the institution and other involved individuals with the names of the principals involved and the names, addresses and telephone numbers of any people contacted during the NCAA investigation. The institution is required to notify past or present staff members or prospective, past, or present student-athletes who may be affected by the charges that they have the opportunity to submit any information they desire to the Committee and that they and their personal legal counsel may appear before the Committee. The institution is also required to investigate the charges and to indicate whether it feels that the allegations are substantially correct. It may also submit written evidence to support its response to the official inquiry. *See* NCAA Bylaw 32.5.

After the institution has submitted its written response to the official inquiry in a case involving a major violation, the enforcement staff must "prepare a summary statement of the case that indicates the status of each allegation and identifies the individuals upon whom and the information upon which the staff will rely in presenting the case." The summary is presented to the Committee, the institution, and all other affected individuals before the Committee hearing. NCAA Bylaw 32.5.10(a). The institution and affected individuals and their legal counsel are permitted to review any memoranda or documents upon which the enforcement staff will rely in the presentation of its case, but only at the NCAA national office. NCAA Bylaw 32.5.10(b).

Prior to the Committee on Infractions hearing, prehearing conferences are held with the NCAA staff, the institution and all affected individuals and their legal counsel. At those meetings, the NCAA staff is required to provide all of the information upon which it intends to rely at the hearing. All involved parties review the relevant documents. Areas of factual dispute are identified. Unsupported allegations may be withdrawn and the institution and affected individuals can determine whether they need to conduct any further interviews in order to supplement their responses to the official inquiry. NCAA Bylaw 32.5.10(c).

The Committee on Infractions hearing consists of a detailed presentation of the case by the enforcement staff followed by a response from the institution and any affected individuals (or their legal representatives) who desire to respond. NCAA Bylaw 32.6.5. After the hearing, the Committee members privately make their determinations of fact, determine appropriate corrective action, if any,

and prepare their written report. NCAA Bylaws 32.6.6, 32.7. The institution is entitled to appeal the Committee's findings of fact and any corrective action taken against it to the NCAA Council. NCAA Bylaw 32.9.

In 1991, the Nevada legislature enacted the Statute. Essentially, the Statute requires any national collegiate athletic association[3] to provide a Nevada institution, employee, student-athlete, or booster who is accused of a rules infraction with certain procedural due process protections during an enforcement proceeding in which sanctions may be imposed.[4] Many of the procedures required by the Statute are not included in the NCAA enforcement program. For example, the NCAA does not provide the accused with the right to confront all witnesses, the right to have all written statements signed under oath and notarized, the right to have an official record kept of all proceedings, or the right to judicial review of a Committee decision.

The Statute provides that a state district court may enjoin any NCAA proceeding that violates the statutory provisions. Furthermore an aggrieved institution which raises a successful challenge under the Statute is entitled to costs, reasonable attorney's fees, and compensatory damages equal to "100 percent of the monetary loss per year or portion of a year which is suffered … as a result of a penalty imposed in violation of [the Statute]." Nev.Rev.Stat. § 398.245. Finally, the Statute prohibits an association from impairing the rights or privileges of membership of any institution as a consequence of any rights

granted by sections 398.155–398.255. *Id.* § 398.235(3). Thus, the NCAA can not avoid complying with the Statute by simply expelling its Nevada members.

This action arose when appellants, who were charged with NCAA rules violations in a pending investigation of the University of Nevada, Las Vegas ("UNLV"), asserted their right to have the proceedings against them comply with the Statute. The NCAA filed a complaint for declaratory judgment and injunctive relief in which it sought a declaration that the Statute was unconstitutional because it violated the Commerce Clause and the Contract Clause.[5] The NCAA also sought an order enjoining the application of the Statute to the infractions proceeding. The district court found that the Statute violates both the Commerce Clause and the Contracts Clause and enjoined its application to the NCAA's proceeding against the appellants. This appeal ensued.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

A district court's ruling on the constitutionality of a state statute is reviewed de novo. *Polykoff v. Collins,* 816 F.2d 1326, 1335 (9th Cir.1987). The same standard of review applies to a district court's interpretation of a statute or ruling on mixed questions of law and fact that implicate constitutional rights. *United States v. 50.50 Acres of Land,*

---

**3.** A national collegiate athletic association is defined as a "group of institutions in 40 or more states who are governed by the rules of the association relating to athletic competition." Nev.Rev.Stat. § 398.055.

**4.** Specifically, the Statute requires an association to provide the accused with the procedural rights: 1) to a hearing after reasonable notice of the nature of the proceeding, the governing rules, and the factual basis for each alleged violation, Nev.Rev.Stat. § 398.155(1); 2) to be represented by counsel, *id.* § 398.155(2); 3) to confront and respond to all witnesses and evidence, *id.;* 4) to the exchange of all evidence 30 days before any proceeding, *id.* § 398.155(3); 5) to have all written statements signed under oath and notarized, *id.* § 398.155(4); 6) to have an official record

kept of all proceedings, *id.* § 398.165; 7) to receive transcriptions of all oral statements upon request, *id.* § 398.175; 8) to exclude irrelevant evidence, *id.* § 398.185(1); 9) to have an impartial person presiding over the proceeding, *id.* § 398.195; 10) to have a decision rendered within a reasonable time, with findings of fact based upon substantial evidence in the record and supported by a preponderance of such evidence, *id.* § 398.205; and 11) to a judicial review under the Nevada Administrative Procedures Act, *id.* § 398.215.

**5.** The NCAA also alleged violations of the First and Fourteenth Amendments. Neither of these claims was adjudicated by the district court and the parties have not discussed them in their briefs to this Court.

931 F.2d 1349, 1352 (9th Cir.1991); *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## DISCUSSION

If either of the district court's determinations was correct, the Statute must fall. As we will demonstrate, the Statute cannot withstand Commerce Clause scrutiny. That being so, we need not and do not address the Contract Clause issue.

### A. *Legal Standards*

The Supreme Court has outlined a two-tiered approach to analyzing state economic regulations under the Commerce Clause.

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Healy v. Beer Institute,* 491 U.S. 324, 337 n. 14, 109 S.Ct. 2491, 2499 n. 14, 105 L.Ed.2d 275 (1989) (quoting *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) (citations omitted in original)). Applying this test, we must first ask whether the Statute: 1) directly regulates interstate commerce; 2) discriminates against interstate commerce; or 3) favors in-state economic interests over out-of-state interests. If the Statute does any of these things, it violates the Commerce Clause per se, and we must strike it down without further inquiry. If we determine that the Statute has only indirect effects on interstate commerce and that it regulates evenhandedly, then we must apply the balancing test. *See also Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

### B. *The Statute Violates the Commerce Clause Per Se*

The district court held that the Statute does not violate the Commerce Clause per se because it does not directly discriminate against interstate commerce or favor in-state economic interests over out-of-state interests. *Miller I,* 795 F.Supp. at 1483. That holding was error because discrimination and economic protectionism are not the sole tests. The court should also have considered whether the Statute directly regulates interstate commerce.

It is clear that the Statute is directed at interstate commerce and only interstate commerce. By its terms, it regulates only interstate organizations, *i.e.,* national collegiate athletic associations which have member institutions in 40 or more states. Nev.Rev. Stat. § 398.055. Moreover, courts have consistently held that the NCAA, which seems to be the only organization regulated by the Statute, is engaged in interstate commerce in numerous ways. It markets interstate intercollegiate athletic competition. *See NCAA v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 101–02, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984) (finding by implication that NCAA was engaged in interstate commerce and was subject to antitrust regulation). The NCAA schedules events that call for transportation of teams across state lines and it governs nationwide amateur athlete recruiting and controls bids for lucrative national and regional television broadcasting of college athletics. *Justice v. NCAA,* 577 F.Supp. 356, 378 (D.Ariz.1983); *accord Hennessey v. NCAA,* 564 F.2d 1136, 1150 (5th Cir.1977). Thus, the Statute regulates only interstate organizations which are engaged in interstate commerce, and it does so directly. In fact, it applies no such panoply of procedural rights to voluntary organizations which operate wholly within the State of Nevada.

The Statute would have a profound effect on the way the NCAA enforces its rules and regulates the integrity of its product. The district court found that in order for the NCAA to accomplish its goals, the "enforcement procedures must be applied even-handedly and uniformly on a national basis." *Miller I,* 795 F.Supp. at 1484. That finding

is not only correct, but is also consistent with the Supreme Court's statement that the integrity of the NCAA's product cannot be preserved "except by mutual agreement; if an institution adopted [its own athlete eligibility regulations] unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed." *Board of Regents of Univ. of Okla.*, 468 U.S. at 102, 104 S.Ct. at 2960.

In order to avoid liability under the Statute, the NCAA would be forced to adopt Nevada's procedural rules for Nevada schools. Therefore, if the NCAA wished to have the uniform enforcement procedures that it needs to accomplish its fundamental goals and to simultaneously avoid liability under the Statute, it would have to apply Nevada's procedures to enforcement proceedings throughout the country.

■ The practical requirement that the NCAA would have to use the Statute in enforcement proceedings in every state in the union runs afoul of the Commerce Clause in two ways. First, "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336, 109 S.Ct. at 2499.

The Statute would force the NCAA to regulate the integrity of its product in every state according to Nevada's procedural rules. Thus, if a university in state X ("U of X") engaged in illicit practices while recruiting a high school quarterback from state Y, the NCAA would have to conduct its enforcement proceeding according to Nevada law in order to maintain uniformity in its rules. Nevada procedures do not allow the Committee on Infractions to consider some types of

evidence, like hearsay and unsworn affidavits, that it can consider under the NCAA Bylaws. As a result, if its case against the U of X were based on unsworn affidavits from unavailable witnesses, the NCAA might not have enough admissible evidence to prove that there was a violation of the recruiting rules. The NCAA could be forced to allow the U of X to use an illegally recruited quarterback from state Y because it could not prove a rules violation under the strictures of Nevada law. In this way, the Statute could control the regulation of the integrity of a product in interstate commerce that occurs wholly outside Nevada's borders. That sort of extraterritorial effect is forbidden by the Commerce Clause.

The Statute's extraterritorial reach also violates the Commerce Clause because of its potential interaction or conflict with similar statutes in other jurisdictions. "Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336–37, 109 S.Ct. at 2499.

Nevada is not the only state that has enacted or could enact legislation that establishes procedural rules for NCAA enforcement proceedings. Florida, Illinois, and Nebraska have also adopted due process statutes[6] and similar legislation has been introduced in five other states.[7] Those statutes could easily subject the NCAA to conflicting requirements. For example, suppose that state X required proof of an infraction beyond a reasonable doubt, while state Y only required clear and convincing evidence, and state Z required infractions to be proven by a preponderance of the evidence. Given that the NCAA must have uniform enforcement procedures in order to accomplish its fundamental goals, its operation would be disrupted because it could not possibly comply with all three statutes. Nor would it do to say that it need only comply with the most strin-

6. *See* Fla.Stat.Ann. §§ 240.5339–.5349 (Florida's Collegiate Athletic Association Compliance Enforcement Procedures Act); 110 I.L.C.S. 25/1–25/13 (Illinois' Collegiate Athletic Association Compliance Enforcement Procedures Act); Neb. Rev.Stat. §§ 85–1201 to –1210. (1990) (Nebraska Collegiate Athletic Association Procedures Act).

7. The states are Kansas, Kentucky, Missouri, Ohio, South Carolina. Affidavit of Alton G. Burkhalter at 2, ¶ 5.

gent burden of persuasion (beyond a reasonable doubt), for a state with a less stringent standard might well consider its standard a maximum as well as a minimum. The serious risk of inconsistent obligations wrought by the extraterritorial effect of the Statute demonstrates why it constitutes a per se violation of the Commerce Clause.

Under *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084, when a state law directly regulates interstate commerce, it can generally be struck down without further inquiry. The Statute directly regulates interstate commerce and runs afoul of the Commerce Clause both because it regulates a product in interstate commerce beyond Nevada's state boundaries, and because it puts the NCAA, and whatever other national collegiate athletic associations may exist, in jeopardy of being subjected to inconsistent legislation arising from the injection of Nevada's regulatory scheme into the jurisdiction of other states. Because the Statute violates the Commerce Clause per se, we need not balance the burden on interstate commerce against the local benefit derived from the Statute.[8]

### C. The Entire Statute Must Fall

"[A] court should refrain from invalidating more of [a] statute than is necessary." *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). When a statute contains unobjectionable provisions that are separable from those found to be unconstitutional, a court reviewing the statute should maintain the statute in so far as it is valid. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 1479, 94 L.Ed.2d 661 (1987). The standard for determining the severability of an unconstitutional provision is: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (per curiam) (quoting *Champlin Refining Co. v. Corporation Comm'n*, 286 U.S.

210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932)); *see Board of Natural Resources v. Brown*, 992 F.2d 937, 947–49 (9th Cir.1993).

The Nevada legislature enacted the Statute in order to regulate interstate commerce. If we were to invalidate all of the provisions of the Statute that directly regulate interstate commerce, nothing of consequence would remain. Thus, our inquiry into the possibility of severance must end almost before it begins because no provision of the Statute can be characterized as "unobjectionable." The entire Statute and all of its provisions violate the Commerce Clause because they impermissibly regulate interstate commerce.

### CONCLUSION

We appreciate Nevada's interest in assuring that its citizens and institutions will be treated fairly. However, the authority it seeks here goes to the heart of the NCAA and threatens to tear that heart out. Consistency among members must exist if an organization of this type is to thrive, or even exist. Procedural changes at the border of every state would as surely disrupt the NCAA as changes in train length at each state's border would disrupt a railroad. *See Southern Pac. Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). It takes no extended lucubration to discover that. If the procedures of the NCAA are "to be regulated at all, national uniformity in the regulation adopted, such as only Congress can prescribe, is practically indispensable...." *Id.* at 771, 65 S.Ct. at 1521. In short, when weighed against the Constitution, the Statute must be found wanting. It violates the Commerce Clause.

AFFIRMED.

---

8. If balancing were necessary or appropriate, the balance struck by the learned trial judge was exactly right. *See Miller I*, 795 F.Supp. at 1483–85. If the NCAA is suffering from a procedural disease, Nevada's attempted cure is as likely to destroy the patient as it is to banish the disease. It is not an example of permissible praxis.