**Jerry JAMGOTCHIAN, Appellant**

v.

**KENTUCKY HORSE RACING COMMISSION; John T. Ward, Jr., in his official capacity, as Executive Director, Kentucky Horse Racing Commission; Robert M. Beck, Jr., in his official capacity as Chairman, Kentucky Horse Racing Commission; and Tracy Farmer, in his official capacity as Vice–Chair, Kentucky Horse Racing Commission, Appellees**

2014–SC–000108–DG

Supreme Court of Kentucky.

RENDERED: MAY 5, 2016

COUNSEL FOR APPELLANT: Richard A. Getty, Kristopher D. Collman, The Getty Law Group, PLLC

COUNSEL FOR APPELLEES: Robert M. Watt, III, Steven B. Loy, Anthony Joseph Phelps, Monica Hobson Braun, Stoll Keenon Ogden PLLC, Susan Bryson, Speckert Kentucky Horse Racing Commission

OPINION OF THE COURT BY JUSTICE HUGHES

On May 21, 2011, Appellant Jerry Jamgotchian claimed Rochitta, a bay filly, for $42,400 in a claiming race at Churchill Downs in Louisville, Kentucky. Foaled February 26, 2008 in Pennsylvania, Rochitta was first purchased at the 2009 Keeneland Yearling Sales in Lexington, Kentucky for $160,000 by Rabbah Bloodstock. Prior to her debut at Churchill Downs, Rochitta had run previously at Saratoga Race Course and Belmont Park in New York as well as Keeneland Racecourse and Turfway Park in Kentucky. She had never finished better than third place (in two races at Turfway) prior to the maiden claiming race at Churchill Downs where she finished second. After being claimed by Jamgotchian on May 21, 2011, Rochitta's next race was on July 8, 2011 at Presque Isle Downs in Erie, Pennsylvania where she again had a second place finish. She raced three more times that summer at Presque Isle before heading to the Mountaineer Racetrack in Chester, West Virginia where she claimed her first victory on October 14, 2011. Her next and final races were at Tampa Bay Downs in Florida in December 2011 and January 2012. Having concluded her multi-state racing career, Rochitta was shipped to the Tattersalls December 2012 Mares Sale in Newmarket, England by her new owner where she sold for $480,330. At sale, Rochitta was in foal, having been covered by

Hat Trick, a Japanese-bred sire. She was purchased by Mattock Equine of Kildare, Ireland.[1]

Rochitta's life and times are of interest to this Court because she is the basis for Jerry Jamgotchian's claim that certain Kentucky thoroughbred racing regulations violate the Commerce Clause of the United States Constitution. The regulations challenged provide in pertinent part:

> (1) In claiming races a horse shall be subject to claim for its entered price by a licensed owner in good standing, or by the holder of a certificate of eligibility to claim . . . .
>
> * * * * * *
>
> (6)(a) A horse claimed in a claiming race shall not be sold or transferred, wholly or in part, within thirty (30) days after the day it was claimed, except in another claiming race.
>
> (b) Unless the stewards grant permission for a claimed horse to enter and start at an overlapping or conflicting meeting in Kentucky, a horse shall not race elsewhere until the close of entries of the meeting at which it was claimed.

810 Kentucky Administrative Regulations (KAR) 1:015, § 1 (1), (6). Violations of these provisions can, among other things, result in the purchaser of the horse being fined or having his or her Kentucky owner's license suspended. 810 KAR 1:028.

The question this case poses is whether these restrictions on the transfer and racing of claimed thoroughbreds, restrictions often referred to in the industry as the "claiming jail" (and referred to herein as the "Article 6 restrictions" or simply as "Article 6"), run afoul of the so-called "negative" or "dormant" Commerce Clause. Dormant Commerce Clause jurisprudence derives from the limitation on state regulatory authority that the United States Supreme Court has found implicit in the federal Constitution's Commerce Clause (U.S. Const., Art. I, § 8, cl. 3), which grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." We are convinced that the challenged Kentucky regulations—regulations similar (often identical) to regulations in effect in the large majority of states that allow wagering on thoroughbred horse races—do not conflict with the federal Constitution's insistence on an interstate commerce unburdened by state-erected barriers against that commerce.

The challenged regulations are merely evolved, updated versions of regulations that have applied to "selling" or "claiming"—type horse races for hundreds of years, but, more importantly, they are by no means pervasive and unavoidable governmental restrictions because any thoroughbred horse (including Rochitta as her history illustrates) can be bought and sold (assuming a willing buyer and willing seller) in Kentucky without regard to these regulations through either a private sale transaction or at auction. In essence, the buyer who claims a horse at a licensed Kentucky race track has voluntarily chosen a form of purchase that is closely

---

1. Rochitta's history is derived from *http://www.equibase.com* (last visited 4/1/2016). Equibase Company is a partnership between subsidiaries of the Jockey Club and the Thoroughbred Racing Associations of North America and its website serves as the thoroughbred industry's official database. Information regarding the Tattersalls December 2012 Mares Sale is derived from http:/ /www.tattersalls. com/archived-catalogues.ph. It appears that Jamgotchian sold Rochitta in early 2012, shortly after her last career start at Tampa Bay Downs, to Baroda & Colbinstown Studs of Ireland. Ray Paulick, *"Who says you can't make money in horse racing?"* Paulick Report (Dec. 7, 2012), http://www.paulickreport. com.

regulated (indeed, the sale is enforced) by the state racing authority and, in doing so, has contracted for the horse at a guaranteed pre-race price binding on the horse's owner and the buyer, both of whom receive advantages in the carefully structured claiming process but also agree to certain limited restrictions. And in fact, the Article 6 restrictions which claiming owners such as Jamgotchian agree to by presenting a binding pre-race claim are fleeting; the claiming jail has quickly vanishing bars, as illustrated by Rochitta's run at Presque Isle in Pennsylvania a few weeks after her Churchill Downs debut.

Turning to the constitutional issues, we agree with the lower courts that the Commonwealth is not actually a market participant as that concept is currently understood in dormant Commerce Clause jurisprudence, but we cannot agree with their conclusions that regulating thoroughbred racing is itself a governmental function that results in all racing regulations getting the usual "government" pass under the Commerce Clause. We do recognize, however, as did the lower courts, that thoroughbred racing only exists because the Commonwealth allows it to exist with extensive regulation of racetracks and the requisite pari-mutuel betting (legalized gambling) necessary to racing's survival. The uniqueness of this industry, an industry that depends on the blessing of the state for its very existence, but more importantly the limited scope and terms of the voluntarily-encountered Article 6 regulation demand the nuanced approach to dormant Commerce Clause analysis which has characterized several

United States Supreme Court opinions. So, while Jamgotchian, as a claiming owner, has a sufficient "case or controversy" to sustain this action, he does not have a winning claim. When Article 6 is placed in its proper context it is essentially a contract term that has evolved, not for economic protectionism, but to advance the underlying purpose of a claiming race, the classification of thoroughbreds for racing purposes. Jamgotchian knowingly and voluntarily agreed to this limited restriction when he sought the benefits of claiming Rochitta in a regulated claiming race rather than buying her in a private sale transaction or at auction. In the final analysis, Article 6 survives the strict scrutiny applicable to laws that appear facially discriminatory, and, accordingly, we affirm the lower courts.

### RELEVANT FACTS

Jamgotchian is, or at least was in 2011 when this case arose, a California resident and a leading owner of thoroughbred race horses. According to Jamgotchian's complaint, he owned at that time in excess of eighty thoroughbred horses, and in the first half of 2011 his horses were so successful at winning purses that he ranked as one of the United States' seventy winningest thoroughbred owners. Among the tracks where Jamgotchian was licensed and where his horses raced was Churchill Downs, a race track licensed by the Commonwealth of Kentucky.

In this country presently, thoroughbred horse racing is conducted for the most part by licensed racing associations[2] at

---

**2.** The organization of racing associations—whether public or private, and if private whether for-profit or not-for-profit—varies among the thirty-eight or so states where horse racing is allowed, but in Kentucky private, for-profit corporations own and operate the state's licensed thoroughbred tracks.

Kentucky Revised Statutes (KRS) 230.210; KRS 230.300. As for thoroughbred racing regulation in the United States generally see Alexander M. Waldrop, Karl M. Norbert, John W. Polonis, *Horse Racing Regulatory Reform Through Constructive Engagement by Industry Stakeholders with State Regulators*, 4 Ky. J.

"tracks" during periods referred to as "meets" or "meetings" assigned to the association by the state agency responsible for racing regulation. 810 KAR 1:001(40) (defining "meeting" as "the entire period of consecutive days, exclusive of dark days, granted by the commission [Horse Racing Commission] to a licensed association for the conduct of live horse racing.") In Kentucky, the agency that regulates racing is the Kentucky Horse Racing Commission (HRC or the Commission),[3] the appellee in this case and the agency that promulgated the Article 6 restrictions at issue. In 2011, HRC assigned to Churchill Downs the period from April 30 through July 4 for its Spring meeting. During that meet, on May 21, 2011, Jamgotchian, pursuant to Kentucky's claiming regulations, claimed Rochitta prior to her start in a $40,000 claiming race. A "claiming race" is "any race in which every horse running in the race may be transferred in conformity with 810 KAR Chapter 1," the thoroughbred racing chapter of Kentucky's administrative regulations. 810 KAR 1:001(12). As noted above, under Chapter 1 (810 KAR 1:015 Section 1(1)), "[i]n claiming races a horse shall be subject to claim for its entered price by a licensed owner in good standing." Jamgotchian claimed Rochitta for the $40,000 claiming price and also paid taxes of $2,400, for a total of $42,400.

As a claimer, Rochitta was subject to the "Article 6" restrictions, and thus was not to be sold or transferred for thirty days, except via "another claiming race," and, absent steward permission for an in-state exception, she was not to race "elsewhere," i.e., anyplace other than Churchill Downs, until the close of entries for Churchill's spring meet (July 1, 2011, according to the Commission). Notwithstanding Article 6, in May and June, 2011, prior to the end of Churchill's meeting, Jamgotchian sought to enter Rochitta in several races in Pennsylvania, including the Lyphard Stakes run in mid-June at the Penn National Race Course in Grantville, Pennsylvania, and a race (apparently a claiming race) on June 28, 2011 at Presque Isle Downs in Erie, Pennsylvania. As it happened, Rochitta did not run in any of those races,[4] and the Commission never issued sanctions against Jamgotchian. Nevertheless, in July 2011, Jamgotchian filed a Complaint in the Franklin Circuit Court against HRC and certain of its officers seeking, among other things, a declaration that by precluding him (via the threatened sanctions) from racing his Kentucky-claimed horse "elsewhere,"—including anywhere outside Kentucky—for the duration of the pertinent meet the Article 6 restrictions violate the Commerce Clause either because they discriminate against interstate commerce or because they burden that commerce unreasonably.

---

Equine, Agric. & Nat. Resources L. 389 (2012) (Waldrop).

3. See KRS 12.020 (making the Horse Racing Commission a part of the Public Protection Cabinet) and KRS 230.225 (creating the Kentucky Horse Racing Commission "as an independent agency of state government to regulate the conduct of horse racing and parimutuel wagering on horse racing, and related activities within the Commonwealth of Kentucky").

4. The parties dispute why exactly Rochitta did not run in any of the Pennsylvania races. Jamgotchian claims that with respect to at least some of the races the Article 6 restrictions interfered; the Commission maintains that in several instances, at least, the race was simply cancelled when it failed to attract a sufficient number of entrants, so that Article 6 had nothing to do with Rochitta's not racing. The trial court detected a measure of truth in both accounts, but held that Article 6 was sufficiently implicated to permit the case to go forward.

After some initial skirmishing over Jamgotchian's standing, the ripeness of his claim, and his claim's vulnerability to the Commission's sovereign immunity—all questions answered in Jamgotchian's favor—the parties submitted the Commerce Clause question on competing motions for summary judgment. The trial court resolved that question in favor of the Commission.

The trial court explained its conclusion by invoking two lines of analysis. Under the first, a line one might refer to as standard dormant Commerce Clause analysis, the court began by asking whether the challenged regulations discriminate against interstate commerce. It determined that they do not, since they apply in the same way to all owners claiming horses, without distinction between Kentucky residents and non-residents such as Jamgotchian. In light of that determination, the trial court then asked whether the regulations imposed any incidental burdens on interstate commerce that outweighed their benefits, whether interstate or intrastate. In the court's view, the Article 6 restrictions, because of their limited duration—about three months maximum—have a minimal effect, if any, on interstate commerce, whereas their benefit to Kentucky's thoroughbred racing industry, an industry, of course, in which Kentucky takes a keen interest, both economically and culturally, is substantial. As the trial court saw it, the Article 6 restrictions, by tending to counteract one of the drains on the supply of horses competing at a given meet, encourage larger race fields at that meet, which in turn increases the interest in and the amount of money wagered on the meet's races, a benefit resulting in larger purses, payoffs, handle,[5] and tax receipts to all the interests involved. Under standard Commerce Clause analysis, the trial court concluded, the Article 6 restrictions pass constitutional muster.

That conclusion was bolstered, in the trial court's view, by a second line of dormant Commerce–Clause analysis, a line the United States Supreme Court introduced relatively recently in the cases *United Haulers Ass'n. Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007) and *Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008). As the trial court characterized them, those cases stand for the proposition that "government action[s] in discharging traditional government functions are outside the scope of the restrictions of the Commerce Clause." *Jamgotchian v. Ky. Horse Racing Comm'n*, 11–CI–01047, p. 4 (Nov. 29, 2012). Rather than the standard dormant Commerce–Clause analysis, under these cases, according to the trial court, even a discriminatory state regulation does not violate the dormant Commerce Clause provided the discrimination favors the state itself in its pursuit of one of its "traditional government functions," as opposed to the more typical protectionism set up in favor of local private interests.

5. The regulations define "handle" as "the aggregate of all pari-mutuel pools, excluding refundable wagers." 810 KAR 1:001(29). In the pari-mutuel system of wagering, at least as practiced in Kentucky, the associations do not participate in the wagering, but are paid commissions based on the handle. KRS 230.3615. The parimutuel or French pool form of betting now used nationwide was first introduced in Kentucky. Joan S. Howland,

*Let's Not "Spit the Bit" in Defense of the Law of the Horse: The Historical and Legal Development of American Thoroughbred Racing,"* 14 Marq. Sports L.Rev. 473, 496–97 (2004) (Howland). See also *Grinstead v. Kirby*, 110 S.W. 247, 33 Ky.L.Rptr. 287 (1908) (concluding that because licensed Kentucky race tracks were expressly authorized by statute to sell "combination or French pools" those participating by betting could not be prosecuted).

The trial court acknowledged that horse racing in Kentucky is conducted by private, for-profit corporations. In its view, the alternative analysis of *United Haulers* and *Davis* still applied, however, because, notwithstanding that private interest, the horse racing industry is, and for more than a century has been, so heavily regulated and so infused with a public interest as to "meet[ ] the broad criteria for traditional government function contemplated by the Supreme Court." *Jamgotchian* at p. 5. In other words, even if there were some doubt about the validity of the Article 6 restrictions under standard dormant Commerce Clause analysis, that doubt would vanish in light of the Supreme Court's deference in *United Haulers* and *Davis* to the states' "traditional government functions," of which, in Kentucky at least, regulated thoroughbred horse racing is one.

Jamgotchian appealed from that decision and the Court of Appeals affirmed. If anything, that Court embraced even more enthusiastically than had the trial court the traditional-government-function line of analysis. It agreed with the trial court that "the regulation of horse racing is, and always has been, a traditional government function, at least since 1894 in Kentucky." *Jamgotchian v. Kentucky Horse Racing Comm'n,* No.2012–CA–002154–MR, p. 7 (Feb. 7, 2014). And having made the "involvement" of a traditional government function the first question to address in determining the Commerce–Clause validity of a challenged regulation, the Court of Appeals panel relegated the standard Commerce Clause concerns of discrimination against and undue burden upon interstate commerce to roles as minor factors of no real concern when states are engaged in their "traditional functions."

We granted Jamgotchian's motion for discretionary review to address his dormant Commerce Clause assertions but are compelled first to address the Commission's assertion that given the relevant facts surrounding Rochitta's attempts to race in Pennsylvania in the summer of 2011, there is no case or controversy for this Court to consider.

## ANALYSIS

As noted above, the constitutional question at the heart of this case was presented to the trial court by way of the parties' competing motions for summary judgment. Summary judgment is appropriate if, but only if, construed favorably to the non-movant, the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rule of Civil Procedure (CR) 56.03. Under our rule, summary judgment should not be granted if it appears that the non-movant has any realistic chance of producing evidence that would warrant a favorable judgment. *Labor Ready, Inc. v. Johnston,* 289 S.W.3d 200, 203 (Ky.2009) (citing *Steelvest, Inc. v. Scansteel Service Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky.1991)). We review the trial court's "no issue of material fact" determination without deference under that "any realistic chance" standard. *Stilger v. Flint,* 391 S.W.3d 751, 753 (Ky.2013) (citing *Hammons v. Hammons,* 327 S.W.3d 444, 448 (Ky.2010)). The trial court's "matter of law" conclusions, of course, including its construction of statutory and constitutional provisions, we review de novo. *Nash v. Campbell Cty. Fiscal Court,* 345 S.W.3d 811, 816 (Ky.2011) ("[O]n appeal of a summary judgment, ... [i]ssues of law are reviewed de novo."); *Bd. of Educ. v. Hurley,* 396 S.W.3d 879, 885 (Ky.2013) (noting that statutory construction is a matter of law); *Greene v. Commonwealth,* 349 S.W.3d 892, 898 (Ky. 2011) (constitutional construction is a mat-

ter of law). Here, once past the "case or controversy" question noted above, the only material question is the purely legal one concerning the constitutionality of Article 6.

## I. Sufficient Controversy Exists to Address the Constitutional Issue.

■ The Commission contends that Kentucky courts (this Court as well as the lower courts) do "not have jurisdiction over Jamgotchian's declaratory judgment claim because there is no case or controversy." The Commission argues, essentially, that while the Rochitta incident may have caused some sparks it did not result in flames: notwithstanding Jamgotchian's threats and attempts to race Rochitta in Pennsylvania, she did not race "elsewhere" during her Churchill "jail" period, and consequently the Commission never sanctioned Jamgotchian. Without some such concrete injury or consequence to complain about, the Commission insists, Jamgotchian's assertions that he *might* have been sanctioned in conjunction with Rochitta or that he *might* face sanctions in the future in conjunction with some future Kentucky-claimed horse are simply too speculative to satisfy the requirement that courts address only "actual" controversies, not speculative or academic ones. We agree with the courts below, however, that Jamgotchian's eligibility as a licensed owner in good standing to claim horses at Churchill Downs renders his interest in the constitutionality of Kentucky's claiming regulations sufficiently concrete to satisfy Kentucky Revised Statute (KRS) 418.040, our declaratory judgment statute. That statute allows a plaintiff to ask for, and a court to make, a declaration of rights provided that the court otherwise has jurisdiction and "it is made to appear that an actual controversy exists."

■ As we explained in *Jarvis v. National City*, 410 S.W.3d 148, 153 (Ky.2013), a declaratory judgment action allows persons within, or arguably within, the scope of a statute "to have their rights and obligations [under the statute] declared without being forced to act improperly and initiate litigation after an injury has occurred." In that case, the corporate trustees of testamentary trusts sought a declaratory judgment regarding their right to charge reasonable fees for their services rather than being constrained by a rigid fee structure imposed by a since-repealed statute in effect when the trusts were created. The trustees and the beneficiaries of the trusts were of differing views regarding allowable trustee compensation so the risk of "wrong action" was real and the controversy was "actual," not merely theoretical or hypothetical. By contrast, in *Foley v. Commonwealth*, 306 S.W.3d 28 (Ky.2010), this Court upheld the denial of a motion for a declaration that Kentucky's self-defense statutes were unconstitutional, finding no justiciable case or controversy. The denial was proper in *Foley* because the challenged self-defense statutes had no foreseeable application to the movant himself.

■ This case is far more like *Jarvis* than like *Foley*. Jamgotchian was, and apparently remains, an eligible claimant under Kentucky's thoroughbred claiming rules with a demonstrated interest in exercising that eligibility and exercising it in a way the Commission is apt to deem "wrongful." Eliminating or minimizing such a genuine risk of "wrong" action by any of the parties "is the very purpose of declaratory judgment actions." *Jarvis*, 410 S.W.3d at 153. Thus, as the Court of Appeals correctly determined, the trial court did not exceed its jurisdiction under KRS 418.040 by entertaining Jamgotchian's complaint.[6]

## II. The Dormant Commerce Clause Doctrine Generally.

 In *Department of Revenue of Kentucky v. Davis,* Justice Souter summarized the Supreme Court's modern dormant Commerce Clause doctrine and its standard test for Commerce Clause compliance as follows:

> The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States," Art. I, § 8, cl. 3, and although its terms do not expressly restrain "the several States" in any way, we have sensed a negative implication in the provision since the early days[.] . . . The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism[,] that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. . . . The point is to effectuate the Framers' purpose to prevent a State from retreating into [the] economic isolation . . . that had plagued relations among the Colonies and later among the States under the Articles of Confederation[.] . . . The law has had to respect a cross-purpose as well, for the Framers' distrust of economic Balkanization was limited by their federalism favoring a degree of local autonomy. . . . Under the resulting protocol for dormant Commerce Clause analysis, we ask whether a challenged law discriminates against inter-state commerce. . . . A discriminatory law is virtually *per se* invalid, . . . and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives[.] . . . Absent discrimination for the forbidden purpose, however, the law will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.

553 U.S. at 337–39, 128 S.Ct. 1801 (citations and internal quotation marks omitted). Thus summarized, Commerce Clause analysis seems straight forward enough. First, is the challenged provision discriminatory, *i.e.,* does it intend or bring about " 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter' "? *United Haulers,* 550 U.S. at 338, 127 S.Ct. 1786 (quoting *Oregon Waste Sys., Inc. v. Dep't of Environmental Quality of Or.,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). If so, the provision is considered *per se* invalid unless the state overcomes that presumption by demonstrating a legitimate (*i.e.,* nonprotectionist) purpose for the discrimination and by showing that the purpose cannot be adequately served in a different, non-discriminatory way. If not discriminatory on its face, the challenged provision is valid, unless the challenger can show that, although seemingly non-discriminatory, the provision nevertheless burdens interstate commerce in a way or to a degree that is

---

**6.** As for HRC's initial challenge to Jamgotchian's standing, we note particularly *General Motors Corp. v. Tracy,* 519 U.S. 278, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997), in which the Court discusses the interests required to establish standing to bring a Commerce Clause challenge against an allegedly discriminatory state law. It notes that "cognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates" but may extend to those, such as customers of discriminated against companies, who indirectly bear the burdens of that discrimination. Jamgotchian's standing is appropriately established along these lines, since arguably he bears a cognizable burden stemming from Kentucky's alleged discrimination, via Article 6, against non-Kentucky race tracks.

clearly out of proportion to the provision's valid local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

Invoking this formula, Jamgotchian maintains that the Article 6 restrictions are discriminatory on their face, since they expressly prohibit the owners of thoroughbreds newly claimed in Kentucky from racing those horses at out-of-state tracks, tracks that compete with the Kentucky tracks where the newly claimed horses are allowed to race. Article 6 is thus presumptively invalid, according to Jamgotchian, and it must be struck down unless the Commission can show that it serves a legitimate, non-protectionist purpose for which there exist no alternative, non-discriminatory means. Since the Commission does not argue that Article 6 would survive that sort of strict scrutiny,[7] Jamgotchian concludes that the courts below erred by not declaring Article 6 *per se* unconstitutional.

 As the Supreme Court has itself acknowledged, however, Commerce Clause analysis is a more nuanced undertaking than the simple summary of it might suggest. *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n. 12, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (citing *Brown–Forman Distillers Corp. v. New York State Liquor*

*Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), for the observation that "no clear line" separates the "discriminatory" from the "non-discriminatory" strands of dormant Commerce Clause analysis). For instance, the Supreme Court has fashioned a number of exceptions to the standard analysis, such as, for example, *United Haulers*, 550 U.S. at 330, 127 S.Ct. 1786 (upholding discriminatory regulation in favor of "traditional public function" as opposed to discrimination in favor of private enterprise); *Davis*, 553 U.S. at 328, 128 S.Ct. 1801 (applying that same exception to a discriminatory tax); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (upholding discriminatory regulation that favored, as opposed to private enterprise, the government's own "participation in the market."); *Henneford v. Silas Mason, Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937) (upholding discriminatory interstate use tax that merely "compensated" for intrastate sales tax). The Court has also rejected a knee-jerk approach to both the initial determination of whether a challenged law discriminates, *General Motors Corp. v. Tracy*, 519 U.S. at 278, 117 S.Ct. 811 (upholding an apparently discriminatory tax exemption for local natural gas utilities when, upon closer

---

7. The Commission and both lower courts purport to avoid Jamgotchian's argument by noting that Article 6 does not distinguish between Kentucky owners and out-of-state owners but applies the same temporary transfer ban and racing restrictions to both groups. The Commission and the lower courts all concluded that, at least with respect to Jamgotchian's complaint, its equal treatment of all owners makes Article 6 non-discriminatory and thus subject not to the sort of strict Commerce Clause scrutiny Jamgotchian wants, the sort applied, for example, in *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), but rather to the less exacting *Pike* test. As noted above, however, we agree with Jamgotchian

that Article 6 *appears* at least to discriminate against out-of-state race tracks in favor of Kentucky's tracks and that Jamgotchian has standing to challenge that alleged discrimination if he is made to bear the burden of it, albeit indirectly. The fact that Article 6 does not discriminate directly against out-of-state owners, therefore, does not, by itself, defeat Jamgotchian's claim for strict scrutiny. As explained below, however, Article 6's "discrimination" against out-of-state racetracks is more apparent than real; and so, even if the lower courts ought not to have stopped with Article 6's direct effect upon owners, their conclusion that Article 6 is not subject to the *per se* invalidation was ultimately correct.

consideration, it appeared that the utilities did not compete—at least in the most important market—with the allegedly discriminated against out-of-state natural gas sellers), as well as the subsequent determination of whether a discriminatory law is invalidly protectionist or serves a sufficiently compelling, non-protectionist local purpose. *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (upholding discriminatory ban against importation of out-of-state baitfish as only feasible means of protecting native species). In *Pike v. Bruce Church*, moreover, the Court made clear that the "lesser" scrutiny applicable to nondiscriminatory state laws does not equate to "no" scrutiny or to merely cursory application of presumptions. 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (holding unconstitutional a facially neutral cantaloupe shipping regulation). What these cases illustrate, among other things, are the wide variety of circumstances in which Commerce-Clause issues can arise and the difficulty of articulating rules that survive translation from one set of circumstances to the next. They also illustrate the Supreme Court's grappling with that difficulty by, on the one hand, adhering, at least initially, to the basic steps of its standard analysis, but doing so, on the other hand, with sensitivity to the salient realities of the particular form of commerce involved. See, *e.g.*, *Davis*, 553 U.S. at 334–35, 128 S.Ct. 1801 (discussing history of municipal bonds and their tax treatment); *Tracy*, 519 U.S. at 282–85, 117 S.Ct. 811 (discussing development and deregulation of natural gas industry); *Taylor*, 477 U.S. at 140–42, 106 S.Ct. 2440 (discussing the feasibility of inspecting imports of live baitfish). In a very real sense, for both strands of dormant Commerce Clause analysis "the critical consideration is the overall effect of the statute on both local and interstate ac-

tivity." *Brown–Forman Distillers Corp.*, 476 U.S. at 579, 106 S.Ct. 2080.

To say that the challenged claiming jail regulation is *per se* invalid is to ignore the overarching principles of dormant Commerce Clause jurisprudence in favor of a narrow-lens view. That narrow view ignores the challenged regulation's origin and purpose; its minimal effect on the realm of commerce in which it operates, namely thoroughbred horses; and the knowing and voluntary choice on the part of claiming owners such as Jamgotchian necessary to even bring the regulation into play. As discussed more fully *infra*, the challenged regulation appears to be somewhat unique in the reported cases because not only is it not comprehensive and pervasive in its effect on commerce (applying only to claimed thoroughbreds, as opposed to all Kentucky-purchased thoroughbreds, and then only for a matter of weeks at most), it is essentially a contract term that is knowingly and voluntarily agreed to by any prospective owner who opts to purchase via a claiming race at a Kentucky track as opposed to through a private sale transaction or at auction. Before turning to the thoroughbred industry generally and the history and specifics of claiming races and their regulation, we first address the lower courts' conclusions regarding the applicability of the governmental function exception to dormant Commerce Clause analysis.

## III. The Lower Courts' Misapplication of *United Haulers* and *Davis*.

In granting summary judgment to the Commission and in affirming that Judgment, the trial court and the Court of Appeals both relied in significant part on *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt Auth.*, decided in 2007, and *Dep't of Revenue of Kentucky v. Davis*, decided in 2008. In *United*

*Haulers* the Supreme Court upheld against a Commerce–Clause challenge an ordinance requiring trash haulers to bring locally collected waste to a particular waste processing facility. The Court had previously struck down an almost identical "flow control" ordinance on the ground that it discriminated against interstate commerce in waste processing. *C & A Carbone, Inc. v. Clarkstown,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). The difference between the two cases, the *United Haulers* Court explained, was that, whereas in *C & A Carbone* the challenged ordinance "forced haulers to deliver waste to a particular *private* processing facility," the laws at issue in the later case "require haulers to bring waste to facilities owned and operated by a state-created public benefit corporation." 550 U.S. at 334, 127 S.Ct. 1786.

█ The Court found the private entity/public corporation distinction constitutionally significant. For, while the Court's Commerce Clause cases had long employed a presumption that state laws discriminating against interstate commerce in favor of local *private* enterprise were motivated by the sort of "simple economic protectionism" the Commerce Clause is meant to prevent, and hence "are subject to a Virtually *per se* rule of invalidity," ' 550 U.S. at 338, 127 S.Ct. 1786 (quoting *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)), that presumption is not appropriate with respect to laws favoring the government itself. As the *United Haulers* Court explained,

> States and municipalities are not private businesses—far from it. Unlike private enterprise, government is vested with the responsibility of protecting the health, safety, and welfare of its citizens.... Given these differences, it does not make sense to regard laws favoring local government and laws favoring private industry with equal skepticism.

550 U.S. at 342–43, 127 S.Ct. 1786 (citations omitted). Accordingly, laws favoring government can be deemed non-discriminatory for Commerce Clause purposes (provided all private companies—in-state and out-of-state—are treated the same), and can be upheld without the rigorous scrutiny typically applied to laws favoring instate businesses vis-à-vis out-of-state competition, since "[l]aws favoring local government ... may be directed toward any number of legitimate goals unrelated to protectionism." 550 U.S. at 343, 127 S.Ct. 1786.

The contrary approach, the Court worried, *i.e,* treating public and private entities the same under the dormant Commerce Clause, "would lead to unprecedented and unbounded interference by the courts with state and local government." *Id.* The impropriety of such judicial interference was underscored in *United Haulers,* the Court noted, by the fact that "[w]aste disposal is both typically and traditionally a local government function." 550 U.S. at 344, 127 S.Ct. 1786 (citation and internal quotation marks omitted). In line with that tradition, the New York counties before the Court had opted not to rely on competition among private firms to address their increasingly pressing and complex solid waste management problems, but instead had displaced that competition with regulation and monopoly public control. "We may or may not agree with that approach," the Court summed up, "but nothing in the Commerce Clause vests the responsibility for that policy judgment with the Federal Judiciary." 550 U.S. at 344–45, 127 S.Ct. 1786.

The Court reiterated its *United Haulers* holding in *Dep't of Revenue of Kentucky v.*

*Davis,* a case that concerned a taxpayer's challenge to Kentucky laws allowing an income-tax exemption on the interest earned on bonds issued by Kentucky or its subdivisions, but not exempting interest income on state or municipal bonds issued elsewhere. The case was decided by a five-member majority, and it generated seven opinions, reflecting a degree of disarray in dormant Commerce Clause jurisprudence,[8] or at least a degree of complexity sufficient to make judges reluctant to venture sorting it all out. Upholding the Kentucky income-tax exemption for interest on Kentucky-issued bonds, the *Davis* majority explained that the rationale of *United Haulers, i.e.,* the constitutionally significant distinction between traditional government functions, such as municipal solid waste management, and private enterprises, such as the private waste-processing facility at issue in *C & A Carbone,* "applies with even greater force to laws favoring a State's municipal bonds, given that the issuance of debt securities to pay for public projects is a quintessentially public function, with [a] venerable [at least 300 year] history." 553 U.S. at 341–42, 128 S.Ct. 1801. The tax exemption at issue, moreover, was itself a long-standing and widespread means of supporting the government's bonds: "It should go without saying that the apprehension in *United Haulers* about 'unprecedented ... interference' with a traditional government function is just as warranted here, where the Davises would have us invalidate a century-old taxing practice ... presently employed by 41 States, ... and affirmatively supported by all of them." 553 U.S. at 342, 128 S.Ct. 1801 (citations omitted).

Indeed, concerns about undue interference with so basic a government function

as bond issuance led the Court to go further and to explain that Kentucky's laws could be upheld under *United Haulers* even without the lesser sort of scrutiny (so called *Pike* balancing after the rule in *Pike v. Bruce Church,* 397 U.S. 137, 90 S.Ct. 844) often applied to non-discriminatory state laws to insure that they do not burden interstate commerce unreasonably. Such rational-basis type scrutiny was not appropriate in this case, the Court insisted, because the questions involved exceeded the Court's capacity to provide answers.

It would miss the mark to think that the Kentucky courts, and ultimately this Court, are being invited merely to tinker with details of a tax scheme; we are being asked to apply a federal rule to throw out the system of financing municipal improvements throughout most of the United States, and the rule in *Pike* was never intended to authorize a court to expose the States to the uncertainties of the economic experimentation the Davises request.

553 U.S. at 356, 128 S.Ct. 1801.

*United Haulers* and *Davis,* therefore, stand for the proposition that regulations and tax provisions favoring the government's own functions, at least functions the government has traditionally performed, are not subject to the same skepticism and the same scrutiny under the Commerce Clause as that applied to regulations and tax provisions favoring local private enterprises at the expense of interstate commerce. We agree with Jamgotchian that *United Haulers* and *Davis* do not control here, because, unlike the municipal waste processing at issue in *United Haulers* and the municipal bonds at the heart of *Davis,* thoroughbred horse racing is not, in Kentucky at any rate, a government function.

---

8. The United States Court of Appeals for the Fifth Circuit recently referred to the Supreme Court's dormant Commerce Clause jurisprudence as "quite simply, a mess." *Churchill Downs Inc. v. Trout,* 589 Fed.Appx. 233, 235 (5th Cir.2014).

Churchill Downs, where Jamgotchian claimed Rochitta, may well be subject to strict licensing requirements and a host of other regulations, and it may stage Kentucky's most beloved event (and the world's most prestigious horse race), the Kentucky Derby, but the fact remains that Churchill Downs and the other licensed racing associations in the state are private enterprises. Their main concern is their shareholders, not the health, safety, and welfare of Kentuckians generally. That being so, regulations such as the Article 6 restrictions at issue, regulations which favor, or at least which appear to favor, Kentucky's race tracks by imposing some limits on a claiming owner's ability to race a claimer at out-of-state tracks do not get a Commerce Clause pass under *United Haulers* and *Davis*. They must rather, as Jamgotchian insists, undergo the more standard sort of Commerce Clause analysis.

Against this conclusion, the Commission argues (and the courts below agreed) that while horse racing itself may not be a traditional government function for the purposes of *United Haulers* and *Davis*, in Kentucky the *regulation* of horseracing certainly is. According to the Commission, thoroughbred racing is vital not only to Kentucky's economy—a healthy racing industry being crucial to the health of Kentucky's substantial thoroughbred breeding industry—but to its very identity as "the Bluegrass State." Given how thoroughly regulated that industry has been for more than a century now[9], the Com-

mission maintains that the entire industry should be deemed a public function, with the tracks not so much independent, private enterprises as agents of that public purpose.

This argument has some definite appeal, and it might give us pause, had the Supreme Court not already rejected its equivalent. Justice Souter's dissent in *C & A Carbone*, after all, made a very similar argument to the effect that the waste processing facility deemed in that case to have been given a monopoly over local waste processing in derogation of the Commerce Clause was in actuality a municipal facility notwithstanding the fact that technically it was private. Only two other members of the Court, then-Chief Justice Rehnquist and Justice Blackman, joined that dissent, and Justice Souter himself later noted in *Davis* that the *C & A Carbone* majority had not been overruled. 553 U.S. at 347, 128 S.Ct. 1801. In *United Haulers*, moreover, the Court clarified that what the *C & A Carbone* majority had rejected in the dissent was not its public/private distinction but rather its willingness to treat a legally private enterprise as a quasi-public one. 550 U.S. at 340, 127 S.Ct. 1786. The Commission's suggestion that we analyze thoroughbred racing in Kentucky as a quasi-public function notwithstanding the actual legal status of its participants is thus a position that we believe the Supreme Court has foreclosed.

The Commission's suggestion is also untenable in more general terms. The Com-

---

9. HRC notes that their regulations "govern every aspect of horse racing, from establishing the latest minute in a day that a race can begin to requiring that a jockey's buttons be fastened. 810 KAR 1:016, § 1; 810 KAR 1:009, § 14(1). HRC has thirty-six separate regulations-with hundreds of sections and thousands of subsections-that pertain solely to thoroughbred racing, including laws that regulate owners, trainers, jockeys, apprentices, pari-mutuel wagering, medications, testing procedures, and the running of the race." A perusal of thoroughbred racing regulations reveals that every single person who participates in any manner in racing at a Kentucky track must have a state license, everyone from the owners, trainers and jockeys through and including the custodial staff, vendor employees and parking attendants. 810 KAR 1:025.

mission insists that Kentucky's *regulation* of horse racing is itself a traditional government function calling into play the more deferential review applied in *United Haulers* and *Davis,* regardless of whether horse racing is a government function. To be sure, regulation, along with taxation, is perhaps *the* quintessential traditional government function. But regulation (or taxation) by itself cannot be what the Supreme Court meant in *United Haulers* by the phrase "traditional government function," because if it were then *United Haulers* would obliterate, not establish, a Commerce–Clause distinction between private enterprise and government function—the government "regulates" in both instances—and would call into question every case in which a regulation has been invalidated under the sort of strict scrutiny frequently applied to regulations that discriminate against interstate commerce.

■ So simply regulating or even extensively regulating a private function does not render it a "government function" as the *United Haulers* Court made clear. That Court noted that the New York voters who had opted for the government to provide waste management services could just as well have left the matter to private enterprise, but if they had, "any regulation [the State] undertook could not discriminate against interstate commerce." 550 U.S. at 344, 127 S.Ct. 1786. Kentucky's regulation of thoroughbred horse racing, as extensive and as longstanding as that regulation may be, is not by itself sufficient to bring this case within the "traditional government function" rule of *United Haulers* and *Davis.*

## IV. Article 6 Does Not Violate the Commerce Clause.

### A. Article 6 is Not *Per Se* Invalid.

■ As noted above, the trial court invoked *United Haulers* and *Davis* in an attempt to bolster its conclusion that the Article 6 restrictions do not violate the Commerce Clause. It reached that conclusion initially by applying the Supreme Court's standard Commerce–Clause analysis and determining that Article 6 does not discriminate against interstate commerce (resident and nonresident claiming owners being treated the same) and that it passes the *Pike* balancing test for reasonableness. Jamgotchian contends that the trial court's analysis went astray by failing to recognize that Article 6 does discriminate on its face against interstate commerce via the temporary ban on a claimed horse racing out-of-state and, consequently, the regulation's validity hinges on a much more exacting test than the one announced in *Pike.* Under this less forgiving, "strict scrutiny" approach, Jamgotchian insists Article 6 violates the federal Constitution *per se.*

Although we agree with Jamgotchian that in certain respects the trial court's analysis did not go far enough, we are convinced that his own analysis stops short. Heeding, or at least attempting to heed, the Supreme Court's example of resolving Commerce Clause challenges on the basis of commerce realities as much as on "rules" purportedly abstracted from the cases, we conclude that the trial court basically got it right: Notwithstanding a modicum of discrimination, Article 6 is part of a larger, non-discriminatory racing regulation, not a trade regulation, and its protectionist effect is negligible compared with its important racing benefits. More importantly, this regulation is knowingly and voluntarily agreed to by an owner seeking the advantages of a claiming race purchase; it is the legal consequence of a particular type of business transaction, not an unavoidable governmental regulation affecting all commerce in thoroughbred horses in the Commonwealth.

The mechanical, narrow-lens approach to the Commerce Clause urged by Jamgotchian is accurate enough as far as it goes, but it pays scant heed to the particulars of the thoroughbred horse racing industry, and in doing so, not only leaves out what the Supreme Court has indicated is an important part of the analysis, but also grossly overstates the protectionist intent and effect of the Article 6 restrictions. Supplying even a little context makes clear that Article 6 does not discriminate against interstate commerce to any significant extent and that its purpose is not to insulate Kentucky's race tracks from out-of-state competition but rather to preserve a system in which thoroughbred horse racing remains viable and socially acceptable. We turn, then, to a brief consideration of the all-important context for the challenged regulation.

## 1. Thoroughbred horses and racing.

It is no surprise that the General Assembly placed the Horse Racing Commission within the Public Protection Cabinet. Horse racing as we know it "exists only because it is financed by the receipts from controlled legalized gambling which must be kept as far above suspicion as possible." *Jacobson v. Maryland Racing Comm'n*, 261 Md. 180, 274 A.2d 102 (1971). Indeed, in its unusually expansive statement of legislative purpose for KRS Chapter 230, the chapter devoted to Horse Racing and Showing, the Kentucky General Assembly acknowledges as much and more.

It is hereby declared the purpose and intent of this chapter in the interest of the public health, safety, and welfare, to vest in the racing commission forceful control of horse racing in the Commonwealth with plenary power to promulgate administrative regulations prescribing conditions under which all legitimate horse racing and wagering thereon is conducted in the Commonwealth so as to encourage the improvement of the breeds of horses in the Commonwealth, to regulate and maintain horse racing at horse race meetings in the Commonwealth of the highest quality and free of any corrupt, incompetent, dishonest, or unprincipled horse racing practices, and to regulate and maintain horse racing at race meetings in the Commonwealth so as to dissipate any cloud of association with the undesirable and maintain the appearance as well as the fact of complete honesty and integrity of horse racing in the Commonwealth. In addition to the general powers and duties vested in the racing commission by this chapter, it is the intent hereby to vest in the racing commission the power to eject or exclude from association grounds or any part thereof any person, licensed or unlicensed, whose conduct or reputation is such that his presence on association grounds may, in the opinion of the racing commission, reflect on the honesty and integrity of horse racing or interfere with the orderly conduct of horse racing.

KRS 230.215(2).

This has been the Commission's charge since it was first established in 1906. *State Racing Comm'n v. Latonia Agric. Ass'n*, 136 Ky. 173, 123 S.W. 681 (1909) (upholding the Commission's enabling legislation and noting that the General Assembly had tasked and empowered the Commission to "promote the breeding of thoroughbred horses, and the conducting of legitimate races, and to prohibit the evil of unlawful gambling on the race courses"); *Grainger v. Douglas Park Jockey Club*, 148 F. 513, 540–41 (6th Cir. 1906) (upholding the Commission's authority to regulate horse racing in Kentucky and noting that "an invariable accompaniment of the operation of such race tracks [thoroughbred race tracks] is betting on the races there run.... Certainly legisla-

tion whose effect is not to abolish the operation of such race tracks, but to minimize this evil and other evils arising therefrom, has a real and substantial relation to the public welfare and is valid.") In the early twentieth century, public opposition to gambling, an aspect of the then-burgeoning temperance movement, had led to the abandonment of horse racing in many states and to the closure of most of the country's race tracks,[10] unwelcome developments in a state where " '[t]he raising of horses for the track had long been a favored industry ... and much capital was invested in it.' " *Commonwealth v. Kentucky Jockey Club*, 238 Ky. 739, 38 S.W.2d 987, 991 (1931) (quoting *Grinstead v. Kirby*, 110 S.W. 247, 33 Ky.L.Rptr. 287 (1908)). The General Assembly's joining with a handful of other state legislatures (in particular New York's) in regulating rather than banning thoroughbred racing, together with the dramatic success of pari-mutuel wagering at the Kentucky Derby in May 1908, in the face of a threat by local officials to strictly enforce laws newly enacted against bookmaking, were important events in the eventual national restoration of thoroughbred racing as a widely accepted form of public entertainment. Biracree & Insinger at 143–44.

As the General Assembly's statement of purpose for KRS Chapter 230 indicates, the public acceptance of thoroughbred racing continues to be a legislative concern and continues to require the oversight of the gambling that makes racing an industry rather than a hobby. Among the host of conditions necessary to public confidence in the industry is assurance that the races are fair and genuinely competitive. In trying to provide that assurance, the industry has developed an elaborate system for grading the racing ability of thoroughbred horses, often referred to as the horse's class, and has evolved a parallel system of graded races—from the richest stakes races for thoroughbreds of the highest class to the most obscure maiden claiming races for horses at the opposite end of the class spectrum. In simple terms, the grading systems are meant to make racing more transparent, by announcing the caliber of the horses involved in a particular race, and to insure that races pit only horses of roughly equal ability against each other. In the higher class races, entry conditions and handicapping by a track official ensure competitiveness. A track's handicapping resources are limited, however, so in the majority of races, competitiveness requires some other means. Biracree & Insinger at 217. Enter the claiming race.

As noted above, in its capacity as Kentucky's regulator of thoroughbred horse racing, the Commission has defined a "claiming race" as "any race in which every horse running in the race may be transferred in conformity with 810 KAR Chapter 1 [the thoroughbred racing chapter]." 810 KAR 1:001(12). Subchapter 15 of that chapter, the subchapter devoted to claiming races, provides in its first section what we might refer to as the basic claiming rule: "In claiming races a horse shall be subject to claim for its entered price by a licensed owner in good standing." As courts and commentators have observed, "[t]he purpose of the claiming race is to keep owners from entering superior horses in mediocre fields," and in that way "to foster competitive races." *The United States Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 784 (7th Cir.

---

**10.** Tom Biracree & Wendy Insinger, The Complete Book of Thoroughbred Horse Racing 143 (1982). Our references to the history of thoroughbred racing and its regulation are informed by Biracree and Insinger's still pertinent accounts by Robert L. Heleringer, Equine Regulatory Law (2012), and by Howland, *supra*.

1981); *Gill v. Delaware Park, LLC,* 294 F.Supp.2d 638, 641 (D.Del.2003) ("The purpose of claiming races is to insure that horse races are competitive, and that horses of similar ability compete against each other.").[11]

The claiming race works that feat by means of the claiming rule, under which a price is established beforehand, with the understanding that any horse entered in the race is, during a brief period just prior to the start of the race, being offered for sale at that price. An owner tempted to take advantage of the field by entering a superior horse will thus be deterred by the chance, the likelihood even, of losing a good horse, and of having to sell it for less than it is worth. Owners will be deterred from entering inferior horses simply by the fact that such horses have little chance of finishing in the money. The hope, reasonably borne out by centuries of experience, is that, generally at least, the claiming rule will result in transparent, competitive races. It has been so for a long time, as long as there has been thoroughbred racing. According to thoroughbred racing historians, a version of the claiming rule was in effect in England at least as early as 1689. Biracree & Insinger at 217.

By the mid–1800s, a more popular version of the rule had evolved. Under that version, the pre-race understanding was that after the race the winning horse would be auctioned off, with the owner given the claiming price, and any amount bid in excess of that price given to someone else, the someone else varying from place to place and time to time. Sometimes the excess went to the runner-up, sometimes to the track and sometimes it was divided among the track and the other entrants. Biracree & Insinger at 217–18. Eventually, however, that version of the rule, too, lost favor. Its wide application had resulted in a tremendous turnover of horses, and it was felt that rather than punishing the occasional owner who inappropriately dropped a horse in class to snatch a purse, it punished just as severely those owners and trainers who simply were good at preparing their appropriately classed horses for a race. *Id.*

The rule served its basic purpose too well to be abandoned, however, so eventually it evolved again, coming into its modern form, under which buyers must commit themselves to the claim/purchase *before* the race is run and who then own the horse regardless of how it fares in the race. In its modern guise, however, the claiming rule suffers from what those who study rules sometimes refer to as overbreadth. In seeking to deter a narrow form of conduct—the abuse of racing's class-system by an owner entering a superior horse in what is billed as and what is meant to be a lesser field—the rule applies not just to abusive owners but to "class-abiding" owners as well, subjecting everybody in the race to the risk of losing a good or a favored horse. The claiming rule's overbreadth also means that the claiming rule is itself subject to "abuse" by claimants who take advantage of it to claim not just patently and inappropriately undervalued horses, but other horses as well.

In *Jacobson v. Maryland,* for example, a Maryland racing steward testified that under the modern form of the claiming rule, "[a] claiming race is not intended to be a sales ring in which a clever horseman or

---

11. "The easiest way for a racing secretary to produce competitive contests between such animals [the vast majority of thoroughbreds the racing ability of which is no better than mediocre] is to pass the responsibility for appraising a horse's class to the owner and trainer. The way this is accomplished is the claiming race." Biracree & Insinger at 217.

dealer can pick up a bargain and sell it at will." 274 A.2d at 104. The rule, however, according to the steward, had exposed owners participating in earlier Maryland winter meetings to claims by out-of-state horsemen who came to the meets with the purpose of claiming large numbers of horses in order to "take them to other racing States and sell them." *Id.* Accordingly, certain restrictions were adopted, including a claiming jail restriction. "These and others [restrictions] are designed ... to preserve the intent of the claiming rule, to classify horses in what appears to be the most accurate and satisfactory manner." *Id.*

Similarly, in *Gill v. Delaware Park, LLC,* 294 F.Supp.2d 638, local horsemen and track officials had taken sufficient umbrage at what they regarded as Michael Gill's abusive claiming practices (Gill being, at the time, this country's largest-volume thoroughbred owner, with some 270 horses) to seek to ban him from the track. In describing that umbrage, the court notes that under Delaware's basic claiming rule (which is like ours), a tradition had grown up among many owners and trainers of not using the rule, except,

presumably, for its narrow class-enforcing purpose. Gill, however, eschewed that tradition and used the claiming rule aggressively in what was, essentially, an attempt to "corner" the meet's purses.[12]

■ Abuses, or perceived abuses, such as these gave rise to rules like the Article 6 restrictions at issue here, *Jacobson,* 274 A.2d at 104 (quoting the steward's testimony to the effect that to keep the claiming rule from turning claiming races into a "sales ring," restrictions had come to be imposed, such as "a horse cannot change ownership except by claim for sixty days, a horse cannot run at another track until the meeting in which he is claimed is terminated"). Such rules are meant to mitigate the claiming rule's overbreadth by attaching to claims costs that will tend to deter frivolous claims and by deterring aggressive claiming practices that undercut the claiming rule's primary, competition-furthering purpose. Like the claiming rule that they modify and support, short-lived restrictions on post-race conduct such as those in Article 6 have been adopted in a large majority of the jurisdictions that permit wagering on thoroughbred racing.[13]

**12.** According to the court, Gill largely succeeded, winning purse money during the pertinent meet of nearly $2.7 million, while the next most successful owner came in at something under $0.5 million.

**13.** Citing pertinent statutes, the Commission contends that twenty-seven of the thirty-eight wager-allowing states have such restrictions, including Delaware, Illinois, Maryland, New York, and Pennsylvania. Jamgotchian does not contest the Commission's contention. He also concedes that California has likewise adopted such restrictions, but he contends that that state's Racing Board has ceased to enforce them in light of an informal opinion by the California Attorney General deeming them invalid under the Commerce Clause. His brief refers us to pp 89–93 of the trial court record, where we find, as an attachment to Jamgotchian's motion for summary

judgment, what appears to be a letter dated September 2003 from Derry L. Knight, a California Deputy Attorney General, to Roy C. Wood, Jr., the Executive Director of the California Horse Racing Board. Knight is responding, according to the letter, "to a question posed at the July California Horse Racing Board ("CHRB") meeting concerning the board's authority to prohibit a horse claimed in a California claiming race from racing out-of-state for a period of time *beyond that specified in the current board rule.*" (emphasis supplied). The then current California rule, apparently, like the rule in Kentucky, forbade racing a claimed horse "in any State other than California until the close of the meeting where it was claimed." The Deputy Attorney General expressly disavowed any intention to address the legality of the current rule, but he opined that a proposed amendment to that rule, an amendment to the effect that "a horse

Jamgotchian does not suggest that the claiming rule is itself discriminatory or otherwise violative of the Commerce Clause, and we have belabored the long history and central importance of that rule in an attempt to explain why, in our view, the Article 6 restrictions that refine it are not truly discriminatory either, notwithstanding the aspect of them (the ban on "elsewhere" racing for the duration of the pertinent meet) that could, at first glance, seem to be so. First, once due consideration is given to the key role the claiming rule plays in assuring that races at Kentucky's tracks are not only competitive and interesting, but also above-board and fair, one is better able to understand that, any appearances to the contrary notwithstanding, the *purpose* of the Article 6 restrictions is not protectionist discrimination, but rather refinement of the claiming rule and prevention of its abuse.

The *effect* of the Article 6 restrictions is not protectionist, either, as becomes apparent in light of the broad acceptance of the claiming rule as a vital tool of what amounts to a sort of owner self-regulation. As the Commission very candidly acknowledges, Kentucky's meet-duration ban on a local claimer's being raced "elsewhere" has some tendency to prevent disruption of the given meet through the loss of claimed horses. However, claiming "jail" does not give Kentucky's tracks any sort of meaningful leg up in their competition with out-of-state tracks since, even while Kentucky keeps access to the horses "jailed" here, it loses access to the horses "jailed" elsewhere, a situation the vast majority of tracks here and elsewhere understand, expect, and accept. Indeed, the mutuality of such restrictions is undoubtedly the explanation for the claims before us being advanced by a claiming owner instead of one of the "elsewhere" tracks at which a claimed horse cannot race for a few days or weeks. And lest this situation be mistaken for the very sort of protectionist tit-for-tat the Commerce Clause is meant to obviate, it should be reemphasized that the claiming rule is not protectionist in intent. As discussed above, the Commission has compelling reasons—racing integrity reasons, if you will—that have nothing to do with Kentucky tracks' competition with out-of-state businesses for adopting some form of claiming rule that balances the risks/rewards to owners and potential purchasers, and thus has independent reason for as efficient a rule as experience with it can devise.

### 2. Thoroughbred Racing as Competitive Sport.

■ As we carefully examine the context of the Article 6 restriction, one other notable reality bears mention. Thoroughbred horse racing is, of course, a major sport, and as economists and courts have long noted, professional and collegiate sports operate under an unusual economic model. Specifically, the competitors—be they the teams of the National Football League, the member schools of the National Collegiate Athletic Association, or even individual golfers or tennis players—produce a product—competitive sporting events— "that inherently and uniquely cannot be produced by a single [competitor] acting alone." Nathaniel Grow, *Regu-*

claimed out of a claiming race is ineligible to race in any other state *until 60 days after* the close of the meeting at which it was claimed," (emphasis supplied) would violate the Commerce Clause. According to Jamgotchian, that letter prompted California's Racing Board not merely to refrain from amending the then current rule, but to cease enforcing it altogether. Be that as it may, we think his characterization of the informal opinion letter as a determination by the California Attorney General "that the California 'jail time' restrictions violated the Commerce Clause" misstates that letter's import.

*lating Professional Sports Leagues,* 72 Wash. & Lee L.Rev. 573, 586 (2015) (footnote omitted). *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 102, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Am. Needle, Inc. v. Natl. Football League,* 560 U.S. 183, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55 (2nd Cir.1988). To produce the product, therefore, whether a single game or an entire season of games culminating in playoffs and championships, the competitors not only must compete on the field or course or track, but must also agree to a host of rules and regulations that define the game, make clear who is eligible to compete, and otherwise establish the conditions under which the competition is to be carried out. Frequently—as in the major professional league sports, professional tennis, and professional golf—private, centralized associations of competitors and other interested parties are formed to draft and to administer the rules. Such private agreements among competitors raise antitrust concerns and, accordingly, professional sports have given rise to a large body of antitrust litigation.[14] In *Am. Needle,* the Supreme Court rejected a claim by the NFL that its teams should be treated for antitrust purposes as a single entity incapable of conspiring or agreeing with itself. Instead, the Court reiterated, on the one hand, that, in some businesses, "restraints on competition are essential if the product is to be available at all" and that "the interest in maintaining a competitive balance" among competitors can be "legitimate and important," 560 U.S. at 203–04, 130 S.Ct.

2201 (citations and internal quotation marks omitted). On the other hand, however, "competitors cannot simply get around antitrust liability by acting through a third-party intermediary or joint venture." 560 U.S. at 202, 130 S.Ct. 2201 (citation and internal quotation marks omitted). The upshot is that at least in the antitrust context the pro-and anti-competitive effects of trade agreements among sports competitors must generally be assessed on a case-by-case basis.

Unlike football, golf, or car racing, horse racing is also a form of legalized gambling, an activity traditionally subject to public, not private, regulation. Waldrop, *supra,* at 400 (noting the potential commercial advantages of private, cooperative arrangements such as those employed by the major sports leagues, but discussing obstacles to such cooperative arrangements in horse racing, including the fact that "[h]istorically, the public has always been distrustful of privately regulated gambling operations"). The extensive state regulation of horse racing and the legalized gambling accompanying and supporting it means that, uniquely among the country's major sports, horse racing operates for the most part under a decentralized model, with each of the thirty-eight racing jurisdictions responsible for its own racing regulations. Even when separate jurisdictions recognize the desirability of a uniform approach to some aspect of the industry (such as the recognition by at least twenty-seven of the thirty-eight racing states that the claiming rule is appropriately coupled with a brief "jail" period) giving expression to that uniformity is cumbersome at best. *Id.* at 396 (noting that while the Association of Rac-

---

14. See generally Grow, *Regulating Professional Sports Leagues, supra*; Cyntrice Thomas, Thomas A. Baker III, and Kevin Byon, *The Treatment of Non–Team Sports Under Section One of the Sherman Act,* 12 Va. Sports & Ent. L.J. 296 (2013); James T. McKeown, *The Eco-*

*nomics of Competitive Balance: Sports Antitrust Claims After American Needle,* 21 Marq. Sports L.Rev. 517 (2011); Thomas A. Piraino, *A Proposal for the Antitrust Regulation of Professional Sports,* 79 B.U. L.Rev. 889 (1999).

ing Commissioners International, (of which the racing commissioners of all the racing states are members) has as one of its principal purposes the development and publishing of model rules, "there is no mechanism by which to enact and enforce these model rules in individual jurisdictions"). In thoroughbred racing,

> [t]he lack of uniformity combined with the difficulties associated with developing and implementing a cooperative approach have contributed to a regulatory environment that favors the status quo. Since the states regulate the sport within their own respective borders, a semi-competitive environment exists whereby states compete for racing business from owners and trainers because they are capable of searching for the most favorable and least burdensome racing venues. This system has created a forum shopping practice of sorts intended to entice racing business, and has created little or no incentive for the states to dramatically change their rules.

*Id.* at 397.

All of this is meant to underscore the peculiar form of commerce at issue in this case and the need for Commerce Clause analysis sensitive to that peculiarity. We are not dealing with a product or service such as baitfish, *Taylor,* cantaloupe, *Pike,* natural gas, *Tracy,* or waste processing, *United Haulers,* which is needed by the populace and will be bought and sold irrespective of state regulations. Rather, our focus is on thoroughbreds which derive their commercial value solely from the fact that they can be bought and sold to race in state-regulated competitions and perhaps subsequently held for breeding purposes to produce new stock for future racing and the continuation of the sport. Whether their role in this unique competitive sport that depends on legalized gambling regulated by the various states would alone

dictate different considerations for dormant Commerce Clause purposes, we need not decide because in addition to the uniqueness of the realm of thoroughbred commerce generally, the particular regulation at issue does not fit the comprehensive, unavoidable commercial "barrier" model that characterizes dormant Commerce Clause cases.

Superficially, at least, the most analogous type of dormant Commerce Clause case to the facts presented here are those where the Supreme Court has routinely struck down export embargoes, *e.g., New England Power Co. v. New Hampshire,* 455 U.S. 331, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982) (invalidating state's attempt to disallow export of electricity generated within the state), and local processing laws, *e.g., Pike v. Bruce Church, Inc.,* 397 U.S. at 145, 90 S.Ct. 844 (invalidating requirement that state-grown cantaloupes be packed within the state and noting that "the Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere."); *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (plurality opinion deeming invalid Alaska's requirement that timber taken from state land be processed in Alaska before export). As in those cases, the Article 6 restrictions before this Court are triggered by the acquisition of property in this state, and the challenged restrictions limit (*albeit* very temporarily) the export of that property and encourage its use in Kentucky. These very general similarities do not, however, support the same result reached in the seemingly similar embargo and local processing cases because there are very significant differences in the regulations in those cases and Article 6.

The differences are those between permanent and temporary, between total and partial, between serious and slight and between inescapable and voluntary. The laws challenged in the Supreme Court cases just referenced forbade export of the article of commerce entirely or forbade it for as long as the would-be exporter failed to do something, such as employ a local processor. Here, Jamgotchian simply had to wait thirty days to transfer his Kentucky-claimed horse, and, only had to wait forty-two days (May 11 to July 1) to race her in another state.[15] A more analogous regulation is the ten-day hold period on the resale of scrap metal at issue in *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442 (6th Cir.2009). As the Sixth Circuit stated in that case, "scrap metal recycling is big business in Tennessee," resulting in billions of dollars of revenue, with 95% of the metal being eventually sold out of state. *Id.* at 446. In the wake of a historic metal theft crime wave, the challenged Memphis ordinance required scrap dealers to "tag and hold" scrap metal for a period of ten days so that victims of metal theft and law enforcement officials could inspect it. The Sixth Circuit acknowledged that the ordinance was apt to increase storage costs on the dealers and the delay could result in a competitive disadvantage in a volatile metal market, but it nonetheless held the temporary restriction did not unduly burden interstate commerce or outweigh the city's interest in combating metal theft. Article 6, similarly limited in temporal scope and designed to advance a legitimate, non-protectionist local interest (balancing of the class-enforcing measure with restrictions that deter aggressive claiming practices), is even less objectionable.

Additionally, the Commerce Clause litigants in the Supreme Court cases we have reviewed (embargo cases, processing cases or otherwise) were strictly confined to the regulated form of commerce: if they wanted to deal in baitfish, cantaloupe, electricity or whatever article of commerce might be at issue, they had to do so in conformity with the challenged regulation—the alleged barrier to interstate commerce was unavoidable. That is simply not the case before us. As we have belabored, not only does Article 6 stem from legitimate racing (more specifically *claim* racing) concerns, it is a purely voluntarily-encountered regulation. It has no application to private sales or public auctions of thoroughbreds in Kentucky but applies only in the narrow circumstance where a buyer elects to take advantage of the unique purchasing opportunity available in a claiming race. If Jamgotchian wished to avoid the Article 6 restrictions he was free to purchase Rochitta (or another equally desirable thoroughbred) directly from her owner, with whatever attendant terms and costs that approach would entail.[16] As the trial court here noted, "[t]he plaintiffs should not be allowed to obtain the benefits of the claiming races without accepting the relatively slight burden of restrictions on racing the claimed horse at other tracks until the end of the meet." *Jamgotchian v. Kentucky*

**15.** According to the Commission, the longest Kentucky meet lasts approximately three months. Thus, even if someone claimed a horse early in that meet, the ban on racing elsewhere would extend for no more than about ninety days. In the eight months following Jamgotchian's claiming of Rochitta, she raced in Pennsylvania, West Virginia and Florida.

**16.** Cf. *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir.2002) (noting, in the antitrust context, that "a market innovation 'does not restrain trade if an alternative opportunity ... is realistically available.'") (quoting *Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 925 (2nd Cir.1984)).

*Racing Comm'n,* No. 11–CI–01047, at 11 (Nov. 29, 2012).

In sum, however complex and confusing dormant Commerce Clause jurisprudence may be, we are confident that it is not aimed at and does not prohibit a temporary restriction encountered as part of a voluntarily-agreed-to sales transaction, a transaction with inherent commercial advantages to the purchaser not available if that purchaser proceeds in other available ways, *i.e.,* a private sale or public auction. Article 6 serves a legitimate local purpose (as a component part of claiming race rules necessary to classification of thoroughbreds for competitive racing) in the first instance, and regardless of whether the claiming race rule could be structured differently and still achieve that purpose, the myriad opportunities to purchase thoroughbreds generally (including Rochitta herself) in Kentucky through means wholly untouched by this very temporally limited regulation dictate our conclusion that it survives strict scrutiny.

**B. Article 6 is Not Impermissibly Extraterritorial.**

Finally, in a last gasp attempt to avoid the trial court's summary judgment, Jamgotchian invokes *Healy v. The Beer Inst., Inc.,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) for the proposition that the Commerce Clause invalidates not only discriminatory state laws, but also such laws "that ha[ve] the 'practical effect' of regulating commerce occurring wholly outside the State's borders." *Id.* at 332, 109 S.Ct. 2491. Jamgotchian did not present this "extraterritoriality" argument to the trial court or the Court of Appeals, and he presents it to us as a sort of afterthought with little discussion, but his contention seems to be that because the owner of a newly Kentucky-claimed thoroughbred is prohibited from racing the horse outside Kentucky for a prescribed time period, the regulation imposing that prohibition has "obvious and direct extraterritorial effect on the owner of that horse" and so runs afoul of *Healy.* Jamgotchian has not preserved this argument and we could deny consideration of it but, for completeness, choose to address it. Simply put, Jamgotchian reads *Healy* too broadly.

*Healy* addressed a Connecticut statute that required brewers and importers of beer to "affirm" monthly that their beer prices for in-state wholesalers were (and would remain) no higher than the lowest prices they would charge for those products in the states bordering Connecticut. The Supreme Court concluded the price-affirmation statute interacted with beer-pricing statutes in those bordering states in a manner which foreclosed the brewers/importers from altering their prices after the "moment of affirmation," *id.* at 338, 109 S.Ct. 2491, resulting in, for example, the Connecticut law controlling the price of beer in Massachusetts. Not surprisingly, the statute did not survive Commerce Clause analysis. However, *Healy* did not invalidate every state law with some effect on commercial transactions in another state. In *United Haulers,* for example, the challenged regulation mandated that local solid waste be processed at the local, county-run facility and thus in effect forbade solid waste haulers from disposing of their waste at out-of-state processing sites, an even stronger (because permanent) form of the "extraterritorial effect" Jamgotchian objects to here. Nevertheless, the regulation was upheld. In *Pharmaceutical Research and Mfrs. of Am. v. Walsh,* 538 U.S. 644, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003), moreover, the Supreme Court gave short shrift to the broad reading of *Healy* Jamgotchian urges. In *Walsh,* the Supreme Court rejected a *Healy*-based challenge to a Maine prescription

drug rebate program, notwithstanding the fact that the program affected transactions between drug manufacturers and distributors that took place outside of Maine. Unlike the Massachusetts price affirmation statute at issue in *Healy*, the Court explained, the Maine program did not, by its terms or by its effects, "regulate the price of any out-of-state transaction." 538 U.S. at 669, 123 S.Ct. 1855.

As *Walsh* indicates, *Healy* was not addressed to "extraterritorial effects" as such, but rather to attempts by one state "actually ... to regulate activities in other states." *Midwest Title Loans, Inc. v. Mills,* 593 F.3d 660, 665 (7th Cir.2010). In *Midwest Title,* for instance, the Court of Appeals for the Seventh Circuit invalidated under the Commerce Clause and *Healy* a "territorial application" provision of Indiana's consumer protection laws, whereby Indiana sought to apply those laws to Illinois automobile title-loan companies. The fact that the companies advertised in Indiana, the Court explained, did not justify the extraterritorial projection of Indiana's public policy onto the Illinois companies.

Unlike the price affirmation law at issue in *Healy* and the consumer protection laws at issue in *Midwest Title,* Article 6 is not an attempt by Kentucky, directly or indirectly, to regulate horse racing (or any other) activities in other states, and moreover the regulation does not have that unintended effect. Article 6 regulates, rather, claiming races at Kentucky's thoroughbred race tracks and it applies to persons, such as Jamgotchian, who participate in racing at those tracks in a manner that brings them within Kentucky's power to license and to regulate. The mere fact that Article 6 may have incidental effects outside Kentucky does not mean it is at odds with the Commerce Clause.

Jamgotchian also notes that the *Healy* Court voiced concern about competing state regulations that could subject those engaging in interstate commerce to conflicting obligations. 491 U.S. at 336–37, 109 S.Ct. 2491 ("Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State."). *See Nat'l Collegiate Athletic Ass'n v. Miller,* 10 F.3d 633 (9th Cir.1993) (invalidating Nevada statute that imposed procedural rules on NCAA enforcement proceedings in part because the rules imposed by Nevada were inconsistent with rules imposed by other states). He asserts that Article 6 potentially exposes him to that sort of dilemma and so should be deemed invalid. Jamgotchian has not alleged any sort of actual conflict, however, and at first blush it is hard to imagine how another state is apt to create one. There seems little chance, after all, of another state's *requiring* him to race his newly Kentucky-claimed horse at one of its tracks, or *forbidding* him to race it in Kentucky. In short, Jamgotchian's belated extraterritoriality claim provides no basis for relief from Article 6.

### CONCLUSION

In sum, while the lower courts' reliance on the "traditional government function" rationale of *United Haulers* and *Davis* was misplaced, their conclusion that Article 6 does not contravene the dormant Commerce Clause is correct. The trial court correctly determined that the temporary restrictions the Commission imposes through Article 6 on a thoroughbred owner's ability to race a horse that he or she claimed at a Kentucky track are not protectionist in any meaningful way. The fleeting restrictions serve a sufficiently important state interest—helping to ensure the integrity and viability of thoroughbred racing, one of this state's most important

industries—and, more importantly, are applicable only when purchasers voluntarily avail themselves of the privilege and advantages of buying a thoroughbred for a set price in a claiming race as opposed to through a private sale or public auction. Dormant Commerce Clause jurisprudence does not require invalidation of this unique type of regulation. The trial court having correctly granted the Commission's motion for summary judgment, we hereby affirm the February 2014 decision by the Court of Appeals allowing that Judgment to stand.

All sitting. All concur.